Filed 4/14/21  P. v. Alcala CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>   v.<br><br>SALVADOR ALCALA,<br><br>   Defendant and Appellant. | F077833<br><br>(Kern Super. Ct. No. LF011396A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Gary T. Friedman, Judge.

Jacquelyn Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Matthew Rodriguez, Acting Attorney General, Michael P. Farrell, Acting Chief Assistant Attorney General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

## INTRODUCTION

Appellant and defendant Salvador Alcala was charged with several offenses arising out of a domestic violence incident he committed against his former girlfriend in 2016. The charged offenses were alleged to have occurred after defendant committed six prior incidents of domestic violence against her in 2011, 2012, and earlier in 2016.

Defendant was convicted of count 2, first degree burglary (Pen. Code, § 460, subd. (a)),[1] with the special allegation that a person other than an accomplice was present (§ 667.5, subd. (c)(21)); count 3, infliction of a corporal injury upon the mother of his children (§ 273.5, subd. (a)); and count 5, misdemeanor violation of a domestic violence court order (§ 273.6, subd. (b)), all of which were committed on October 15, 2016. He was also convicted of count 4, criminal threats, made on or about and between July 1 and October 15, 2016 (§ 422). He was sentenced to seven years in prison.

On appeal, defendant argues the court abused its discretion when it admitted evidence about the six prior domestic violence incidents that occurred in 2011, 2012, and 2016, and asserts the prior acts should have been excluded under Evidence Code sections 1109 and 352 because the evidence was unduly prejudicial.

Defendant also challenges the court's decision to grant the prosecution's motion to amend count 4, criminal threats, over defense objections. Defendant was originally alleged to have committed the offense on October 15, 2016, when he committed the other charged offenses. At trial, however, the victim testified he did not threaten her on that day but had threatened her on prior occasions. Thereafter, the court granted the motion to amend the date he committed count 4 to on or about and between July 1 and October 15, 2016. Defendant argues this amendment violated his right to notice and due process since there was never any preliminary hearing evidence to support this specific allegation, and the amended dates changed the nature of the charged offense.

_____

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

As a separate issue, defendant argues the court should have given the unanimity instruction for count 4, criminal threats, because the victim testified defendant made numerous threats against her.

Defendant next argues the court abused its discretion when it overruled his hearsay objections and admitted the recording of the 911 call made by the victim's neighbor on October 15, 2016, the day of the charged offenses, because the caller did not personally witness what happened and was relaying information from her mother, who only saw the beginning of the incident.

Defendant raises several issues about the prosecutor's alleged violations of discovery regarding contact information for witnesses, the victim's testimony about her child's diagnosis of posttraumatic stress disorder (PTSD), and the admission of a clinic's report about the victim's injuries and a nurse's testimony about the victim's examination. Defendant also argues the prosecutor committed prejudicial misconduct in closing rebuttal argument.

Finally, defendant asserts the court improperly imposed a restitution fine and fees without determining his ability to pay such amounts.

We are compelled to reverse count 4, criminal threats, because the court improperly amended the charge, and otherwise affirm.

### FACTS

M.R. and defendant met when they were teenagers in 2005. They started dating when he was 15 years old and she was 17 years old. They had an on-and-off relationship, lived together for various times starting in 2007, their relationship ended in 2016, and they had two children who were under the age of 10 years.

M.R. testified they first started living together in 2007 but broke up a few months later when she found out defendant was cheating. After a while, they got back together and lived with defendant's parents. In 2009, their first child was born, and they split up again a few months later. They dated between 2009 and 2011.

3.

M.R. testified defendant was physically abusive to her on several occasions. She called law enforcement more than one time, but she was usually afraid to get help because defendant always threatened to "come back and kill" her if she called the police, and she believed he would do it. She did not describe a particular date when defendant made these threats.

M.R. testified they often argued because defendant continued to cheat on her, and she sometimes threw things at defendant and tried to hit him during these arguments. The last time she did that was in 2015. M.R. testified there were incidents in 2014 where she verbally and physically fought with women who defendant was seeing. M.R. admitted that her statements to law enforcement about some prior incidents were not always accurate and she would leave out certain facts.

### PRIOR DOMESTIC VIOLENCE INCIDENTS

As we will discuss in issue I, *post*, the court admitted evidence about the following six prior incidents of domestic violence that defendant committed against M.R., pursuant to Evidence Code sections 1109 and 352.

### August 2011

M.R. testified that in 2011, defendant moved into her apartment on Montal Street, and they lived together with their first child. After a few weeks, she found out that he was cheating again and made him leave. At some point in the summer of 2011, defendant returned to the apartment, broke down the door, and hit her. Defendant took her phone away from her. Defendant hit her head numerous times and threatened to kill her.

After defendant left, M.R. drove to a convenience store with her child and used the cashier's phone to call 911. When the deputy arrived, she reported the incident but declined an emergency protective order because she wanted to work things out with defendant. M.R. testified defendant also hit her on other occasions prior to this 2011 incident, but she still loved him.

4.

*The investigation*

Kern County Sheriff's Deputy David Hubbard responded to M.R.'s apartment at 3:41 a.m. on August 21, 2011. Hubbard testified that M.R. reported defendant was her ex-boyfriend, and he came to the apartment, entered through an unlocked door, and refused to leave. Defendant asked to stay overnight, but she refused. Defendant became upset and hit her in the face, once with a closed fist and twice with open-handed slaps. M.R. said she tried to call 911, but defendant took her phone and broke it.

Deputy Hubbard did not see any visible injuries on M.R.'s face. Hubbard offered an emergency protective order, but she refused it. Defendant was not at the apartment and Hubbard could not find him.

**March 2012**

M.R. testified that after the August 2011 incident, she learned she was pregnant but lost the child. She continued to have an on-and-off relationship with defendant.

A few months after the 2011 incident, M.R. became pregnant with their second child, and defendant moved back in with her.

On March 24, 2012, M.R. and defendant were still living together. On that day, M.R. drove to the home of defendant's parents to drop off their child on her way to work. Defendant got mad when she tried to leave. They argued because defendant wanted to use the car. M.R. refused because she had to drive to work. Defendant got angry and tried to get her out of the car. M.R. testified she locked the car doors to keep him out. Defendant went to the passenger side, punched the window, reached in, and hit M.R. in the mouth. M.R. testified their child was on the front porch when the incident occurred. Defendant ran away, and his parents called 911.

Defendant's father testified at trial and said he did not see anything, that nothing happened at his house that day, and he never saw defendant do anything to Rodriguez.

5.

### *The investigation*

Deputy Alarcon testified that on March 24, 2012, he responded to the home of defendant's parents and met with M.R. and defendant's father. M.R. was scared and nervous. Alarcon testified the area around her left eye was bruised and swollen, there was blood on her arm, and she complained of pain. M.R. said she argued with defendant about whether he could use her car. She said defendant pushed her into driver's seat and punched her in the face and head about seven times. M.R. said she closed the driver's door and locked it. Defendant smashed the passenger side window, leaned in through the broken glass, and punched her two more times. M.R. said defendant cut his arm when he broke the window, and he bled on her arm when he leaned into the car and hit her.

Deputy Alarcon also spoke with defendant's father that day. The father said he was present and saw defendant lean into the car and hit M.R. Defendant's father said defendant then walked over to the passenger side of the car, broke the window, and continued to punch her.

## March 2016

M.R. testified that she broke up with defendant after the car incident in March 2012. When defendant found out that she was pregnant again, he asked to move in and work things out, and she agreed. Their second child was born later in 2012. Rodriguez, defendant, and their two children lived together from 2012 to 2016.

In March 2016, they were living in a second-floor apartment in a large complex with multiple buildings on Stobaugh Street in Lamont. M.R. testified that defendant would not let her have any friends. During an argument, defendant threw their television and computers down the outer staircase of their apartment unit. M.R. was charging her cell phone at the time. Defendant cut the cord on the charger, broke her phone, and yelled, " 'You think somebody's going to call the cops for you.' He would actually laugh at the fact that he'll break the phone." Defendant said M.R. could not leave and had to stay there.

6.

M.R. tried to leave the apartment with their two children. Defendant grabbed her and threw her from the front door to the hallway; he also hit the back of her head with a shoe.

M.R. testified she escaped with the children and went to a neighbor's apartment to call 911. She told the 911 operator that defendant vandalized her apartment when she asked him to leave. At trial, M.R. testified she did not tell the 911 operator that defendant hit her because "he would always threaten my life," and she was scared.

M.R. testified when the deputy arrived, she felt safe to talk about what actually happened, and reported that defendant hit her. Defendant ran away before the deputy got there. M.R. told the deputy that defendant probably ran to his parents' house. M.R. did not hit defendant or throw anything at him during this incident.

### *The investigation*

Deputy Medeiros testified that on March 17, 2016, he responded to M.R.'s apartment on the vandalism call. M.R. was crying and upset. She reported defendant was at the apartment when she got home, and he was her former boyfriend. She plugged her cell phone into the kitchen wall to charge it and started dinner. Defendant walked into the kitchen and cut the cell phone's power cord. They verbally argued and defendant threw her cell phone. M.R. told defendant she was going to leave him. She said defendant used a shoe to hit her several times in the face, shoulders, and arms. He pushed her against the door and threw her on the floor. M.R. crawled out of the apartment, and said defendant "started basically tossing the apartment," and threw a television down the staircase.

## April 2016

M.R. testified that after the March 2016 incident, she broke up with defendant. She faced possible eviction from the apartment complex because of the conflicts with him. She testified there were two incidents that occurred after March 2016, but she could not remember whether they were in April or May 2016.

7.

M.R. testified the next incident occurred when defendant drove her and the children back to the apartment on Stobaugh Street. Defendant asked to go inside with them, and she said no. M.R. took the children and walked away from defendant's car. Defendant got angry, walked behind her, and kicked her in the buttocks and "smacked" the back of her head. M.R. went to a neighbor's apartment, they calmed her down, and she borrowed their phone and called 911.

M.R. testified that later that same day, she was standing on the patio of her second-floor apartment and holding her cell phone. She saw defendant on the street and he said: " '[Y]ou better not call the cops. I'm going to kill you, and I'm going to kill them. If they get here, watch, watch, watch.' And he just started running toward me." She went inside the apartment, locked the patio door, and hid in the bathroom with the children.

### *The investigation*

Deputy Fernandez responded to M.R.'s apartment on April 26, 2016, and she was crying and upset. M.R. said defendant gave her a ride home and asked to come inside. When she said no, defendant became upset, punched the back of her head, and kicked her in the lower back or buttocks. She was holding the younger child when he hit her.

Deputy Fernandez looked for defendant at his parents' house, but he was not there. Fernandez received another dispatch that M.R. had seen defendant outside her apartment. Fernandez again contacted M.R., and she reported that defendant was watching her from outside the apartment and said "something to the extent of, 'If you call the cops again, I'll make sure you never call the cops ever again,' or something along those lines." M.R. said she was scared defendant was going to hurt or kill her. Fernandez looked for defendant around the apartment complex but could not find him.

**May 2016**

M.R. testified about another incident that she thought occurred in May 2016. Defendant arrived at her apartment and tried to get inside. M.R. held the door shut and

8.

locked the bolt. Defendant used his key and opened the door. M.R. was holding her phone, but defendant took it away from her, and said, " 'You think you're going to call the cops?' " The children were next to her and screaming.

M.R. testified defendant repeatedly hit the back of her head until she fell face down on the floor. Defendant continue to hit her and left marks on her back. M.R. kept blacking out and things became blurry. The incident ended when someone opened the apartment's door. Defendant started laughing and left. M.R. did not hit defendant or throw anything at him during this incident, and she did not call 911.

**July 2016**

M.R. testified that in July 2016, defendant arrived at her apartment on Stobaugh Street for a visit. He asked to spend the night because he did not feel well. She agreed and he slept in another room.

In the morning, M.R. saw that defendant had a small handgun tucked in his pants. Defendant said he would take a shower and leave, and M.R. agreed. Defendant went into the bathroom and undressed. M.R. decided to leave with the children and take the bus. Defendant came out of the bathroom, and he was naked. Defendant realized they were going to leave, and told M.R., " 'You ain't going nowhere, bitch. And he's going with me,' " referring to their younger child. Defendant took M.R.'s cell phone from her. Defendant and M.R. fought over the younger child, with each pulling an arm. Defendant gained control of the child, who was three and a half years old.

M.R. grabbed her older child, and they ran out of the apartment. M.R. believed defendant did not chase her because he was naked, and he held onto their younger child and stayed inside. M.R. did not throw anything at defendant or hit him during this incident.

M.R. and her older child ran to another building in the apartment complex and knocked on the door where A.C. lived with her mother, Maria. M.R. and A.C. had previously worked together and were friends. M.R. testified that Maria. answered the

9.

door and said A.C. was not home. M.R. used the phone and called 911. Maria told M.R. and the child to wait in her apartment, but M.R. said no because she did not want to frighten her with the situation. M.R. and her child stayed in the bushes and waited for law enforcement to arrive.

M.R. testified when the deputy arrived, they went to her apartment and discovered defendant and the younger child were gone.

### *Defendant leaves the child with a neighbor*

Gabriel L. testified he was at the same apartment complex because his family lived there, but he did not know defendant. Gabriel was walking to his car when he saw an officer run through the area with a rifle. When Gabriel reached his car, he saw defendant and the child. He testified that defendant "seemed a little amped up" and "a little upset." Defendant asked Gabriel for a ride. He said the child's mother called the police on him, and he threw away his gun in her apartment. Gabriel refused to give him a ride and left in his car. When Gabriel drove back 10 minutes later, defendant was gone but Gabriel discovered defendant left the child with Gabriel's family.

Gabriel called 911 and reported that a man left a child on their apartment's patio, asked them to take the child back to his "wife's" apartment, and gave them the unit's number. He reported that the man acted weird and could have been on drugs. The dispatcher told Gabriel to wait somewhere safe with the child. Gabriel said he would stay in his own apartment because he did not "want to see that guy again."

In the meantime, M.R. and a friend drove around the area to look for her younger child. About 90 minutes later, she learned the child had been found and a deputy reunited them.

### *The investigation*

Deputy Jose Grande testified that on July 10, 2016, he responded to M.R.'s apartment, and she reported defendant, her ex-boyfriend, arrived and asked to use the restroom, and she agreed. M.R. said he had a firearm. She said she left the apartment

10.

and called the sheriff's department, and her younger child was gone. M.R. did not report that defendant stayed overnight, that he hit her, that she ran away from the apartment, or that she was hiding in the bushes.[2]

Deputy Grande learned from other tenants that defendant had walked through the apartment complex with his child. Grande searched the area but could not find defendant or the child. Grande later received a call that the child was found in the area.

Deputy Grande subsequently located defendant at his parents' house and arrested him. Grande asked defendant about the firearm, and defendant said he left it in his child's room. Defendant said he was not supposed to have a gun because he was on probation, and he would not have used it on his child's mother. Defendant said he bought the gun for self-defense and it did not work.

M.R. later found the firearm in the closet of her child's bedroom and called the sheriff's department to pick it up.

**The criminal protective order**

On the day after the July 2016 incident, M.R. filed documents with the court to obtain a criminal protective order against defendant. The first request was denied. She filed a second request a few days later and it was granted. She obtained both a protective order and custody of the two children. Defendant was granted supervised visitation.

M.R. testified that defendant was arrested and went to jail because of the July 2016 incident.

---

[2] At trial, M.R. testified that when she reported this incident to the deputy, she lied and said defendant had just stopped by to use the restroom. She did not report that defendant stayed overnight because she was afraid of being evicted from the apartment complex if the management knew about her continuing problems with defendant.

11.

## CHARGED OFFENSES – CRIMINAL THREATS

As we will address in issue II, *post*, defendant was convicted in this case of count 4, criminal threats (§ 422), committed on or about and between July 1 and October 15, 2016.

### Defendant's prior threats to M.R.

M.R. testified defendant had threatened to kill her "[s]o many times" and "lots of times" during prior domestic violence incidents, and she was afraid defendant would actually do it. She also testified he had probably threatened her "like, four times" while physically hurting her.

M.R. did not attach any particular time or date to these threats. She testified that defendant's prior threats that he made directly to her had an effect on how she reported incidents to the police. She did not feel comfortable calling law enforcement or talking to them because she was scared about what defendant would do to her.

### Defendant's threats relayed through third parties

At trial, M.R. testified that after the July 2016 incident and before defendant committed the charged offenses in October 2016, she stopped sleeping in her apartment on Stobaugh Street because defendant's family and a mutual friend warned that he was going to do something to her.

M.R. testified that defendant's friend, George, contacted her online through Facebook Messenger and told her that "wherever you stay at, wherever you live, don't sleep there. It's not safe because of the things he says he's going to do."

Defendant's niece called M.R. and said defendant had visited his parents' house, the niece was there, and defendant said that "he was going to kill me."

M.R. testified she also saw defendant's brother, Jose A., who told her that defendant "was saying that he was going to kill me." Defendant's brother told M.R. "not to stay – don't sleep wherever you live, wherever you're staying at," because defendant said he was going to kill her.

12.

As a result of these threats, M.R. and the children no longer slept at the Stobaugh Street apartment, but she occasionally returned to do the wash.[3]

## CHARGED OFFENSES COMMITTED ON OCTOBER 15, 2016

The other charged offenses in this case are based on what happened on October 15, 2016, when M.R. and the children returned to their second-floor apartment on Stobaugh Street so she could do the wash. When M.R. arrived at the apartment, she told A.C. and her mother that she was there. A.C. called M.R. every 30 minutes to check on her. M.R.'s older child played outside, and the younger child was in the apartment with her.

### Defendant breaks into the apartment

Maria testified that she was outside her own first floor apartment and saw defendant arrive in the complex. He was holding a can of beer. Maria testified that defendant leapt up the staircase, went up to M.R.'s second floor apartment, pushed down the door with his hands, and went inside. Maria testified that she immediately tried to find someone to help M.R. Maria did not see what happened inside M.R.'s apartment.

M.R. testified that she was inside the apartment when she heard a "bam." The apartment's door swung open and defendant walked in. He was holding a beer and said, " 'Baby, I'm home. I need to talk to you. We haven't spoken, and there's a lot of things we need to talk about.' "[4]

M.R. was scared and shocked to see him. She thought he was under the influence and described a "twisted look in his eyes." Defendant picked up the younger child and

---

[3] In response M.R.'s testimony about defendant's threats, the court overruled defendant's objections and instructed the jury that M.R.'s statements were "not offered for the truth of the matter, but to explain her conduct and any apprehension or fear she might have in testifying." The court held the evidence was admissible to show her fear, relevant as to her credibility, and explain her prior inconsistent reports to law enforcement.

[4] Defendant was charged and convicted of count 2, first degree burglary, for breaking into the apartment with the intent to commit a felony inside.

said he loved him. Their older child came into the apartment, and M.R. said to run away. Defendant told the child to close the door and stay, and the child obeyed him.

Defendant told M.R. that he heard she was with another man, but " '[y]ou're always going to be mine.' " M.R. tried to grab her cell phone on the kitchen counter. Defendant was still holding the younger child. He reached for the phone, and they fought over it. Defendant got control of the phone and put it in his back pocket.[5] M.R. tried to take the child from him. Defendant cussed her out and held onto the child.

Defendant asked M.R. why she was not happy with him. M.R. tried to explain that she had no "liberty" when she was with him. Defendant said "that if he's going to go to jail, that he might as well make it worth it." M.R. believed he was threatening her life with this statement. Defendant blamed her for putting him in jail after the July 2016 incident, and said, " '[Y]ou're going to pay for this ….' "

**Defendant assaults M.R.**

M.R. testified defendant started to hit her face and head. Defendant kept punching her and she fell. As she lay on the floor, defendant repeatedly kicked her in the stomach and legs. The older child screamed as defendant kicked M.R.[6]

M.R. testified that the beating ended when people came into the apartment. Defendant put down the younger child and ran away. M.R. testified that she did not throw anything at defendant or hit him during this incident.

---

[5] Defendant was charged with count 1, first degree robbery, based on taking Rodriguez's cell phone; he was found not guilty of this offense.

[6] Defendant was charged and convicted of count 3, infliction of corporal injury upon the mother of his child (§ 273.5, subd. (a)), and count 5, misdemeanor violation of a domestic violence court order (§ 273.6, subd. (b)).

**The 911 call**[7]

A.C. testified that she was inside her family's apartment when her mother, Maria, rushed in. Maria was "screaming" in Spanish that defendant "was killing" M.R., and that A.C. had to call 911. A.C. testified she did not see what was going on in M.R.'s apartment, but she immediately called 911 as her mother talked to her in Spanish.

The recording of the 911 call was played for the jury. A.C. reported: "My best friend's getting killed" by defendant; her friend was M.R.; and she gave the address and number of M.R.'s apartment. A.C. said M.R. "has a restraining order against her man and he said he was gonna kill me[,] and my mom just came in screaming saying that he's beating her to death." A.C. told the dispatcher that defendant "just got out last Sunday because she put him in there." The dispatcher asked if an ambulance was needed. A.C. replied, "[H]e is literally beating her right now as we speak." The dispatcher asked A.C. why she was screaming, and A.C. replied: "Because I am so scared for her."

The dispatcher asked if there was anyone else in the apartment with M.R., and A.C. said there were two children. The dispatcher asked if defendant had a gun. A.C. said defendant had a gun the last time he was there. The dispatcher asked why defendant had been in jail. A.C. replied that defendant "beat her up the last time" and "kidnapped" his child "at gunpoint or something like that."[8]

A.C. told the dispatcher that her mother was outside and said defendant "went upstairs, broke down the window and that [M.R. was] screaming and her kids are screaming and that he literally was beating her up."

---

[7] In issue III, *post*, we will address defendant's claim that the court improperly admitted the 911 call because it consists of multiple inadmissible hearsay statements from A.C. and Maria.

[8] At trial, A.C. testified that during the July 2016 incident, she saw defendant run through the apartment complex with the younger child, and M.R. later told her that defendant had a gun that day.

The dispatcher asked A.C. to call back and report if she saw defendant leave before the deputies arrived. A.C. said: "I can't go out there because the last time he was blaming me."

**A.C.'s testimony about the 911 call**

At trial, A.C. testified that her mother rushed into the apartment and screamed defendant was at the apartment complex. A.C. became afraid for her own safety because defendant had just gotten out of jail for kidnapping his child in July 2016, and mutual friends told her what defendant was saying about her.

> "And while he was [in jail] he was telling people that I actually was [M.R.'s] lover and that I convinced her to put him in jail and that it was all my fault that I was the one making [M.R.] come up with all these lies. So that's when I told [the 911 operator], you know, he is blaming me for me putting him in jail; so I was not going to be out there confronting him."

A.C. did not report defendant's prior threats to the 911 operator when she made the call that day, because she figured nothing was going to happen to defendant again.

**The investigation**

Around 9:00 p.m. on October 15, 2016, Deputy Vega responded to M.R.'s apartment and met with her and the two children. M.R. was distraught, crying, and holding the side of her face. The older child had been crying and was holding onto her.

Deputy Vega testified that M.R. reported defendant, her ex-boyfriend, kicked open the locked apartment door, forced his way in, and "went off on her." She thought he had been drinking. Defendant accused M.R. of cheating on him and said she was the reason he went to jail. M.R. said she tried to call 911 but defendant took her cell phone and broke it. She said defendant hit her face with his right closed fist two or three times, and she fell.

Deputy Vega saw swelling and redness on M.R.'s face and neck. The apartment's wooden doorframe was broken, consistent with someone forcing open the door.

16.

Deputy Vega testified that M.R. reported that defendant threatened her during this incident and said he would "come back to finish her off" if she contacted the police. M.R. told Vega she feared for her life and that of her children. She did not want to stay in the same apartment because she believed his threats to come back and assault her again. M.R. showed Vega the paperwork for the protective order she had already obtained against defendant.

Deputy Vega looked for defendant at his parents' house but did not find him that night. Defendant was not taken into custody until November 2017.

**M.R.'s trial testimony about defendant's threats**

At trial, M.R. testified that when she spoke to Deputy Vega on October 15, 2016, she reported that when defendant assaulted her; he said that would kill her if she contacted law enforcement; and he would be back to finish the job. However, M.R. testified that defendant did not threaten to kill her or make those statements on that particular day but had done so on two or three prior occasions.

Instead, M.R. testified about threats that were communicated to her between July and October 15, 2016, as described above, when defendant's niece, his brother, and their mutual friend warned her not to stay at her apartment because defendant said he was going to kill her.[9]

---

[9] As we will explain in issue II, *post*, the complaint and information charged defendant with count 4, criminal threats, committed on or about October 15, 2016, based on Deputy Vega's preliminary hearing testimony about M.R.'s statements, that was consistent with his trial testimony – that defendant threatened to return and kill her if she called the police. At trial, however, M.R. testified defendant did not make this threat on that date, but he threatened to kill her in front of his brother, niece, and friend, and they conveyed the threats to her. Thereafter, the court granted the People's motion to amend count 4 to allege defendant committed the offense of criminal threats on or about and between July 1, 2016 and October 15, 2016. On appeal, defendant argues the court abused its discretion when it granted the motion to amend count 4.

**The nurse's testimony**

Norma Mejia, a family nurse practitioner with Clinica Sierra Vista in Lamont, testified that she examined M.R. at the clinic on October 20, 2016. Mejia reviewed the report she prepared about the examination and testified M.R. said she had been assaulted by her ex-boyfriend and complained of pain on the left side of her face. Mejia testified the left side of M.R.'s face was bruised and swollen, there were bruises on the outside of her right thigh and her right shoulder, and redness around the left eye. Mejia ordered x-rays of her facial bones, jaw, and eye sockets, and there was no evidence of fractures. M.R. said she was already taking Tylenol, and Mejia did not recommend any additional pain medication.

Mejia testified M.R. said she did not pass out during the assault, but she had difficulty remembering what happened and her child had to tell her about it. Mejia testified M.R.'s inability to remember was consistent with a head injury.

**M.R. goes to defendant's house in 2017**

M.R. testified that after defendant assaulted her on October 15, 2016, she obtained help from a domestic violence agency and moved to another residence in late November 2016. She made efforts to keep her address confidential because she was still afraid of defendant, thought he was going to kill her, and wanted to keep her children safe. M.R. contacted a deputy and gave her new rental agreement to him.[10]

M.R. testified that in August 2017, her younger child was diagnosed with posttraumatic stress disorder (PTSD) at Clinica Sierra Vista and begin receiving treatment. He was evaluated because he had displayed anger issues toward other children in day care.

---

[10] In issue V, *post*, we will address defendant's argument that the prosecutor violated discovery by failing to timely produce M.R.'s new rental agreement.

18.

Defendant was not in custody at that time, and he had been granted supervised visitation with the children. He was not going to the visits and the children missed him.[11] M.R. wanted him to have a positive relationship with them. She was also concerned about her younger child's PTSD, and how he often called out for his father.

M.R. testified that on or about November 4, 2017, she went to the home of defendant's parents around midnight because she had learned that defendant was living there. She went there to tell defendant to "sober up, straighten up, your kids miss you. They need you a lot."

M.R. went to the house with Fernando R., who was brother of her new boyfriend. M.R. admitted Fernando was a documented gang member in Lamont. By the time of defendant's trial, Fernando was in custody and awaiting trial for murder. M.R. took Fernando with her that night because she knew defendant was afraid of Fernando's reputation and appearance, and she felt safer with him there.[12]

**Defendant's arrest and M.R.'s subsequent statements**

On November 6, 2017, two days after M.R. went to his parents' house, defendant was arrested and taken into custody for the offenses committed on October 15, 2016.

Deputy Vega testified that on November 22, 2017, the preliminary hearing was held in this case. Prior to the hearing, M.R. met with Vega and the district attorney and gave additional statements. Deputy Vega testified that M.R. said that after the July 2016 incident, she received Facebook messages from defendant's mother and brother, and they told her to move and stay away from her apartment, defendant was not stable, she should

---

[11] During an evidentiary hearing, the prosecutor confirmed defendant had been granted supervised visitation in the criminal protective order and custody ruling that M.R. received after the July 2016 incident.

[12] M.R. testified that when she met with Deputy Vega later in November 2017, she did not tell him that her child had been diagnosed with PTSD, or that she and her new boyfriend's brother (a documented gang member) had confronted defendant earlier in November 2017.

19.

not cooperate with law enforcement, and defendant said he was going to kill her. M.R. said that by the time of the October 15, 2016, incident, she was too scared to sleep at her Stobaugh Street apartment.

M.R. also told Deputy Vegas that after the October 2016 incident, she received financial assistance from a domestic violence agency and moved to a different residence, and presented a copy of her new rental agreement and a medical report about her injuries.[13]

## CONVICTIONS AND SENTENCE

On May 30, 2018, after a jury trial, defendant was convicted of committing the following offenses on or about October 15, 2016: count 2, first degree burglary, with the special allegation that a person other than an accomplice was present; count 3, infliction of a corporal injury upon the mother of his child; and count 5, misdemeanor violation of a domestic violence court order. He was also convicted of count 4, criminal threats, committed on or about and between July 1 and October 16, 2016. Defendant had been charged with count 1, first degree robbery, for taking M.R.'s cell phone; he was found not guilty of this charge.

On July 13, 2018, the court held the sentencing hearing. Defense counsel requested probation. The court found defendant was statutorily ineligible for probation except in unusual circumstances, he had nine prior violations of probation, and there were no unusual circumstances.

The court imposed an aggregate term of seven years based on the upper term of six years for count 2, burglary, plus one year for count 3, infliction of corporal injury (one-third the midterm); stayed the term for count 4 pursuant to section 654; and imposed a concurrent term of local time for count 5.

---

[13] In issues V and VII, *post*, we will address defendant's contentions that the prosecution violated discovery by belatedly producing the new rental agreement and the report from Clinica Sierra Vista.

20.

The court served defendant with a new criminal protective order that prohibited contact with M.R. for 10 years.

On July 19, 2018, defendant filed a timely notice of appeal.

## DISCUSSION

### I.     Admission of Prior Acts of Domestic Violence

Defendant argues the court abused its discretion when it granted the prosecution's motion to introduce the six prior acts of domestic violence under Evidence Code[14] sections 1109 and 352.  Defendant acknowledges prior acts of domestic violence are admissible under section 1109, but asserts the evidence should have been excluded under section 352 because there were "six mini-trials" since the prosecution established the prior incidents through testimony from M.R., other witnesses, the investigating deputies, the 911 calls, and defendant's prior statements.  Defendant further argues the evidence involved an undue consumption of time; the jury may have convicted defendant to punish him for the uncharged offenses; the facts of the prior incidents were more inflammatory than the charged offenses; only the July 2016 incident resulted in a conviction; and the evidence created the substantial danger of undue prejudice.

#### A.     *Section 1109*

We begin with the admissibility of prior acts of domestic violence.  "Ordinarily, propensity evidence – evidence that a defendant committed an uncharged offense – is inadmissible to prove the defendant's disposition to commit the charged offense. (§ 1101, subd. (a).)  Evidence that the defendant committed uncharged crimes or other acts, however, is admissible to prove relevant facts other than disposition, such as motive, intent, and absence of mistake or accident.  (§ 1101, subd. (b).)"  (*People v. Kerley* (2018) 23 Cal.App.5th 513, 531 (*Kerley*).)

---

[14] All undesignated statutory citations in issue I are to the Evidence Code.

21.

"The Legislature … has carved out specific exceptions to this general rule in cases involving domestic violence, elder abuse, and child abuse (§ 1109) and cases involving sexual offenses (§ 1108).  Section 1109 provides, in relevant part, 'in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.'  (§ 1109, subd. (a).)  '[T]he California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence.'  [Citation.]  As a result, section 1109 'permits the admission of defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes. [Citation.]'  [Citation.]  Section 1109 'reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation.'  [Citation.]"  (*Kerley, supra*, 23 Cal.App.5th at p. 531.)

Evidence of prior acts of domestic violence that is admissible under section 1109 "is subject to exclusion under section 352 if the probative value of the evidence is outweighed by a danger of undue prejudice.  [Citation.]  ' "The 'prejudice' referred to in … section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " '  [Citation.]"  (*People v. Megown* (2018) 28 Cal.App.5th 157, 164 (*Megown*); *Kerley, supra*, 23 Cal.App.5th at p. 532.)

"The record must affirmatively show that the trial judge did in fact weigh prejudice against probative value, but no more is required.  [Citation.]  We review the trial court's exercise of discretion in admitting evidence under section 352 for abuse and will not disturb the court's ruling 'except on a showing the trial court exercised its

22.

discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Megown, supra*, 28 Cal.App.5th at p. 164; *Kerley, supra*, 23 Cal.App.5th at p. 532.)

With this background in mind, we turn to the procedural history of the court's decision to introduce the prior acts evidence in this case.

## B.     *The Prosecution's Motion*

Prior to trial, the prosecution filed a motion to introduce five prior acts of domestic violence that defendant committed against M.R. in August 2011, March 2012, March 2016, April 2016, and July 2016.  The prosecution argued the evidence was admissible under sections 1109 and 352, and relevant because defendant committed multiple acts of uncharged domestic violence against her, leading to the currently charged offenses that occurred one week after he was released from custody for committing the July 2016 act. The motion stated the People had already timely served the defense with the statutorily-required written notice that it would move to introduce the prior domestic violence acts.[15]

Defendant's opposition argued the prior domestic violence incidents should be excluded under section 352 because they were unduly prejudicial.  Defendant further argued the August 2011 incident should be excluded because there were no photographs of M.R.'s alleged injuries and it was too remote in time from the current charges; and the July 2016 incident did not involve domestic violence because defendant took his minor child but did not assault M.R. or the child.

## C.     *The Court's Admission of the Five Prior Acts*

Prior to the start of defendant's jury trial, the court addressed the prosecution's motion to introduce the prior act evidence.  It reviewed the provisions of section 1109, and acknowledged it had to engage in a careful weighing process under section 352 to

---

[15] "In an action in which evidence is to be offered under this section, the People shall disclose the evidence to the defendant, including statements of witnesses or a summary of the substance of any testimony that is expected to be offered, in compliance with the provisions of Section 1054.7 of the Penal Code." (§ 1109, subd. (b).)

determine if the probative value of the evidence was substantially outweighed by undue prejudice.

### 1. August 2011

As to the August 2011 incident, when M.R. fled to the convenience store to call 911, defense counsel argued it was too remote from the charged offenses and there were no photographs of M.R.'s alleged injuries. The prosecutor replied a deputy met with M.R., he did not observe any injuries, and she declined medical treatment.

The court held the August 2011 incident was admissible, the probative value outweighed any prejudicial effect, and it was not too remote in time "in view of the other alleged intervening incidents," but it would reconsider the ruling if it ultimately decided to exclude the subsequent incidents that occurred in 2012 and 2016.

### 2. March 2012

The court next reviewed the March 2012 incident, when defendant assaulted M.R. inside the car. The prosecutor said the responding officer would testify that he observed injuries on M.R.'s face, and M.R. would also testify that she was injured.

The court held evidence about the March 2012 incident and the 911 call was admissible, assuming the investigating officer would testify about what he saw. The court found the probative value of the evidence outweighed any prejudicial impact.

### 3. March 2016

As to the March 2016 incident, where defendant threw the electronic equipment down the staircase, the court similarly found evidence about the prior act and the 911 call were admissible, and the probative value outweighed the prejudicial impact.

### 4. April 2016

The court reviewed the April 2016 incident, when defendant drove M.R. and the children to the apartment. Defense counsel claimed there was no report that memorialized M.R.'s statements about the incident. The prosecutor replied that a deputy responded to M.R.'s 911 call and took her statement. The court found the incident was

24.

similar to the other prior acts, the evidence and 911 call were admissible, and the probative value outweighed the any prejudicial impact.

### 5. July 2016

As to the July 2016 incident, where defendant left the apartment with the younger child, defense counsel renewed her argument that the incident did not involve domestic violence because M.R. let him into the apartment, she walked out, he left with his child, and he was not violating any custody or restraining orders. Defense counsel speculated that defendant left his gun in the apartment for the protection of M.R., who was "a single-mother of two, living alone by herself in a high crime neighborhood." Defense counsel argued this particular incident just showed defendant was a bad father.

The prosecutor replied the incident involved domestic violence and showed defendant's escalating and violent behavior against M.R. He assaulted her in March and April 2016, showed up at her apartment with a gun in July 2016 when he did not live there anymore, and left with the youngest child. The prosecutor argued the July 2016 incident was also highly relevant to the charged offenses in October 2016, and whether M.R. was in reasonable fear for her safety from defendant.

The court questioned defense counsel's claim that defendant left the gun in the apartment for M.R.'s protection. It held the evidence about the July 2016 incident, including the 911 call, was admissible, and the probative value outweighed any prejudicial effect "given the … escalating pattern of conduct. And it's reasonable for the jury to determine the inference that can be drawn from that."

### D. *The Court's Further Ruling; the May 2016 Incident*

As the court continued to review the evidentiary motions, defense counsel moved to exclude evidence of any other prior incident that was not reported to law enforcement, and to prevent M.R. from testifying about any other prior incidents because the defense investigator had not found M.R. to request an interview. Counsel acknowledged she had

received M.R.'s contact information but needed more time to get the opportunity to talk to her.

The prosecutor said she did not intend to have M.R. testify about every time defendant had physically abused her during their relationship. However, the prosecutor argued M.R. was "entitled to tell the truth" when she testified, and "the truth of their relationship is that she has long been abused by the defendant," there were multiple prior incidents, and "it absolutely goes to her credibility as a witness." The prosecutor argued that such evidence was "part of a domestic violence case. And absolutely it's prejudicial. All evidence is prejudicial. But it is certainly more probative than it is unduly prejudicial," and it is relevant to her credibility.

The prosecutor said she had not obtained any additional statements from M.R., she only told M.R. to tell the truth when she testified, and she did not know if M.R. planned to testify about other prior acts.

The court stated that it could not rule in a vacuum, but it could not keep M.R. from answering a question truthfully if it required information about something that happened in the past. The court also said that M.R. had the right not to speak with the defense.

As set forth in the factual statement above, M.R. testified at trial about the five prior domestic violence incidents that were addressed in the prosecution's pretrial motion. After she described the March 2016 incident, the prosecutor asked if another incident occurred in April 2016. M.R. testified that there were two incidents, but she could not recall whether they occurred in April or May 2016. The prosecutor asked her to describe the next incident. M.R. testified about the April 2016 incident, when defendant dropped her off at the apartment, she would not let him in, he hit her, and she called 911. The prosecutor then asked M.R. about the next incident, and she testified about an incident that likely occurred in May 2016, when defendant used his key to unlocked the deadbolt in her apartment as she tried to hold the door closed; she did not call 911 after this incident.

26.

**E.** *The Instructions*

The court instructed the jury with CALCRIM No. 375, on the limited admissibility of evidence of prior acts of domestic violence, and CALCRIM No. 852A, defining domestic violence and abuse.

**F.** *Analysis*

"To start our analysis of the balance between probative value and undue prejudice under section 352, we look to the probative value of the evidence. [Citation.] As noted, the Legislature concluded that, in domestic violence cases in particular, a history or pattern of domestic violence is very probative. [¶] ' "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. *Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked.* If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all." [Citation.]' [Citation.]" (*Kerley, supra*, 23 Cal.App.5th at pp. 535–536, italics added.)

" '[T]he statute reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are "uniquely probative" of guilt in a later accusation. [Citation.] Indeed, proponents of the bill that became section 1109 argued for admissibility of such evidence because of the "typically repetitive nature" of domestic violence. [Citations.] This pattern suggests a psychological dynamic not necessarily

27.

involved in other types of crimes.' [Citation.]" (*Megown, supra*, 28 Cal.App.5th at p. 168; *Kerley, supra*, 23 Cal.App.5th at p. 536.)

The court did not abuse its discretion when it decided to admit the prior acts of domestic violence. It was well aware of its discretion under section 352, it considered the probative value of each prior act against its possible prejudicial effect, and held the evidence was admissible because of defendant's continuous and escalating pattern of conduct. The evidence that defendant repeatedly and consistently committed prior acts of domestic violence against M.R. was "more probative than evidence that he did so once or twice; it is the frequency, regularity, and severity [of the prior incidents] that infuses this propensity evidence with probative strength. [Citation]" (*Kerley, supra*, 23 Cal.App.5th at p. 536.)

The testimony from M.R., as corroborated by the deputies who investigated five of the six prior incidents, "set[] forth a continuous and fairly unbroken pattern of domestic abuse" that began in 2011, continued in 2012, and reoccurred throughout 2016, until defendant was held in custody after the July 2016 incident. (*People v. Cabrera* (2007) 152 Cal.App.4th 695, 706.) The cycle of violence corresponded to the periods when M.R. and defendant broke up. M.R. testified that she made defendant leave in 2011 when she found out he was cheating on her. In August 2011, defendant returned to the apartment, broke down the door, and hit her. A few months after the 2011 incident, defendant moved back in with her. M.R. testified she broke up with defendant after the car incident in March 2012. They reconciled later in 2012, and M.R., defendant, and their two children lived together from that time until after the March 2016 incident. The April, May, and July 2016 incidents apparently occurred after they separated.

Defendant was taken into custody after the July 2016 incident and was released about one week before he broke down the door at M.R.'s apartment on October 15, 2016, and committed the charged offenses. The evidence about the prior acts "was highly relevant and probative because it created a strong inference that [defendant] had a

28.

propensity to commit the [current] acts [that M.R.] described." (*Kerley, supra,* 23 Cal.App.5th at p. 536.) Defense counsel asserted in closing argument that defendant did not commit any prior acts of domestic violence, but "[t]he sheer volume of this testimony" from M.R., plus the observations from the investigating deputies about her injuries, was relevant to refute this argument. (*Ibid.*)

The court reasonably found the similarity between the incidents and their repetition over the months and years leading to the charged offenses created a strong inference that defendant had a propensity to commit the charged acts. While defendant suggests the court should have limited the evidence to a stipulation because it was cumulative, the court could reasonably consider the cumulative nature of the evidence was more probative as propensity evidence in the context of the " ' "typically repetitive nature" ' " of these offenses. (*Megown, supra*, 28 Cal.App.5th at p. 168.)

Defendant argues the 2011 incident should have been excluded because it occurred five years before the charged offenses in October 2016, and it too remote under section 352. " 'Evidence of acts occurring more than 10 years before the charged offense is inadmissible … unless the court determines that the admission of this evidence is in the interest of justice.' (§ 1109, subd. (e).) The statute 'clearly anticipates that some remote prior incidents will be deemed admissible and vests the courts with substantial discretion in setting an "interest of justice" standard.' [Citation.] '[T]he "interest of justice" exception is met where the trial court engages in a balancing of factors for and against admission under section 352 and concludes … that the evidence was "more probative than prejudicial." ' [Citation.]" (*Megown, supra*, 28 Cal.App.5th at p. 168.) In this case, the court granted the People's motion to admit the 2011 incident and acknowledged that it would reconsider the ruling if it decided to exclude the additional prior acts that occurred in 2012 and 2016. The court was clearly aware of the passage of time after the 2011 domestic violence incident, but found the evidence was relevant and probative

because it was part of a longer chain of domestic violence incidents he committed against M.R.

Defendant again argues the July 2016 incident should have been excluded because it only showed he was a bad parent, his conduct did not amount to domestic violence, and it may have been limited to child endangerment.[16] While defendant did not break down the door to gain entry in July 2016, he arrived at the apartment while in possession of a handgun. When he realized that M.R. was going to leave with the children, he declared that she was not going anywhere, and the younger child was staying with him. As in prior incidents, he again took M.R.'s cell phone away from her, and then they fought over control of the younger child. Defendant pulled the child away from M.R., and she grabbed her older child and ran from the apartment. Defendant hid his gun in the apartment, walked out with the child, tried to drive away from the area with Gabriel L. and, when Gabriel refused to give him a ride, he left the child with Gabriel's family. Defendant's menacing contact toward M.R., his possession of the gun, his declaration that M.R. could not leave the apartment, and his attempt to control her behavior by

---

[16] Section 1109 defines "domestic violence" by reference to Penal Code section 13700 and Family Code section 6211. (§ 1109, subd. (d)(3).) Under Penal Code section 13700, subdivision (b), " '[d]omestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." Under Family Code section 6211, " '[d]omestic violence' is abuse perpetrated against any of the following persons: [¶] (a) A spouse or former spouse. [¶] (b) A cohabitant or former cohabitant, as defined in [Family Code] Section 6209. [¶] (c) A person with whom the respondent is having or has had a dating or engagement relationship. [¶] (d) A person with whom the respondent has had a child …. [¶] (e) A child of a party or a child who is the subject of an action under the Uniform Parentage Act, where the presumption applies that the male parent is the father of the child to be protected. [¶] (f) Any other person related by consanguinity or affinity within the second degree." In turn, Penal Code section 13700 defines "[a]buse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (Pen. Code, § 13700, subd. (a).)

holding onto the younger child, were sufficient to constitute another act of domestic violence and the incident was properly admitted under section 1109.

Defendant further argues that the evidence about the prior incidents was so confusing even the court could not differentiate between the prior incidents and the charged offenses. In support of this assertion, defendant cites the court's comments as it discussed defense counsel's request for an instruction on voluntary intoxication, based on the evidence that defendant was holding a can of beer when he arrived at M.R.'s apartment on the day of the charged offenses. As the parties discussed whether the instruction should be given, the court asked whether defendant had the beer can when he left the apartment with the younger child. Defense counsel said no, and clarified the instruction was based on defendant's conduct on the day of the charged offenses on October 15, 2016, and that he took the child during one of the prior incidents. The court reviewed its notes and confirmed that M.R. testified that she thought defendant had been drinking that day and agreed to give the instruction as relevant to the charged offenses.

The court's momentary confusion during the instructional conference is insufficient to find that the prior domestic violence evidence should have been excluded under section 352. In addition, CALCRIM No. 375 listed the dates of the prior domestic violence acts, and the prosecutor used closing argument to specifically distinguish between defendant's conduct during each prior act and the charged offenses.

Finally, defendant argues the erroneous introduction of the evidence violated his constitutional right to due process. "The routine and proper application of state evidentiary law does not impinge on a defendant's due process rights. [Citation.]" (*People v. Riccardi* (2012) 54 Cal.4th 758, 809–810, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence" is subject to the traditional test under *People v. Watson* (1956) 46

Cal.2d 818, whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error. (*People v. Partida* (2005) 37 Cal.4th 428, 439.) The trial court did not abuse its discretion when it admitted the prior acts of domestic violence, and the court's ruling did not result in the trial being fundamentally unfair.

## II.     The Amendment of Count 4

Defendant was charged and convicted of count 4, criminal threats, in violation of Penal Code section 422.[17] The information alleged defendant committed the offense on or about October 15, 2016, on the same date as the other charged crimes, based on Deputy Vega's preliminary hearing testimony that M.R. reported that defendant also threatened her that day.

At trial, M.R. testified she made that statement to Deputy Vega, but clarified defendant did not threaten her on October 15, 2016, and testified he had done so on other occasions, and cited the three warnings given to her after the July 2016 incident by defendant's niece, brother, and a mutual friend.

After M.R.'s trial testimony, the prosecution moved to amend the information to allege defendant committed count 4, criminal threats, not on the single date of October 15, 2016, but on or about and between July 1 and October 16, 2016. The court granted the motion over defense objections, and defendant was convicted of this count.

On appeal, defendant contends the court abused its discretion when it granted the People's motion to amend the date of the alleged commission of count 4 to the range of time between July 1 and October 15, 2016. Defendant argues the court violated his constitutional rights to notice and due process when it amended the information to allege the crime occurred on a range of dates because there was no evidence to support this allegation at the preliminary hearing, the amendment turned the alleged violation of

---

[17] All undesignated statutory references in issue II are to the Penal Code.

32.

section 422 into a continuous course of conduct that the prosecutor described as "habitual" threats over a period of months, and it was based on threats conveyed to M.R. by third parties and not made directly by defendant.

## A.    *Section 1009*

The amendment of an information in the midst of trial is governed by principles of notice and due process, as provided in section 1009, which states in relevant part that "[a]n indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination."

As we will also discuss below, "[a] court may allow amendment of an accusatory pleading at any time up to and including the close of trial so long as there is no prejudice to the defendant.  [Citation.]"  (*People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580–1581.)  However, section 1009 " 'specifically proscribes amending an information to charge an offense not shown by the evidence taken at the preliminary hearing.' [Citation.]"  (*Arevalo-Iraheta*, at p. 1581.)

## B.    *The Complaint and the Preliminary Hearing Evidence*

On March 6, 2017, the complaint was filed and alleged defendant committed robbery, burglary, infliction of corporal injury, criminal threats, and violation of a domestic violence court order, "on or about October 15, 2016.

On November 22, 2017, the preliminary hearing was held.  Deputy Vega was the only witness and testified that he responded to M.R.'s apartment on October 15, 2016. M.R. reported that defendant forced his entry into the apartment through the locked door. Defendant accused her of cheating on him while he was incarcerated.  M.R. said she tried to call 911 on her cell phone, but defendant forcibly grabbed it from her.  She said that defendant hit the left side of her face with his closed fist two or three times.

Deputy Vega testified that as to the criminal threats charge, M.R. said that after defendant hit her, he "threatened her and said that he would quote/unquote come back to

33.

finish the job." M.R. said defendant yelled at her that "if she had called 911 or called law enforcement he would kill her," and she feared for her life. M.R. said defendant fled with her cell phone. Vega testified he was familiar with defendant because he arrested him as a result of the prior incident in July 2016.

Aside from Deputy Vega's brief reference to defendant's arrest for the July 2016 incident, there was no testimony about any of defendant's prior acts of domestic violence. He was held to answer on the charges in the complaint.

### C. *The Information*

Thereafter, the information was filed that alleged the same five counts against defendant, all of which were committed on or about October 15, 2016. In count 4, defendant was again alleged to have committed criminal threats in violation of section 422, that he unlawfully threatened to commit a crime that would result in M.R.'s death or great bodily injury, with the specific intent that the statement be taken as a threat, "on or about October 15, 2016."

### D. *M.R.'s Trial Testimony About Defendant's Threats*

As set forth in the factual statement above, M.R. testified at trial that defendant threatened to kill her "so many times" and "lots of times" during the prior domestic violence incidents. She testified these threats had an effect on how she reported incidents to the police. She did not feel comfortable calling law enforcement or talking to them because she was scared about what defendant would do to her. (RT 741)

### E. *M.R.'s Testimony About the Three Threats After July 2016*

At trial, Deputy Vega testified that when he interviewed M.R. on October 15, 2016, she said defendant had threatened her during the assault that day, and said if she contacted law enforcement, he would "come back to finish her off." M.R. said she feared for her life and that of her children.

M.R. testified that while she told Deputy Vega that defendant threatened to come back and finish the job on October 15, 2016, he did not make that statement at the time of the other charged offenses.

As set forth above, M.R. testified that between the July and October 15, 2016 incidents, she received messages from defendant's brother, his niece, and a mutual friend, that warned her that defendant said he was going to kill her and, as a result of these messages and defendant's threats, she no longer slept at her apartment.

### F.     *The Prosecution's Motion to Amend Count 4*

The information had alleged defendant committed count 4, criminal threats, on or about October 15, 2016. After M.R. testified that defendant did not threaten her on October 15, 2016, the prosecutor filed a motion to amend the date alleged in the information for criminal threats to conform to proof, that it was committed on or about and between July 1 to October 15, 2016, based on M.R.'s testimony about the threats conveyed to her by defendant's brother, his niece, and a mutual friend.

At the hearing on the motion, the prosecutor explained the date alleged in the original complaint and information was based on M.R.'s statements to Deputy Vega that he wrote in his crime report, and Vega similarly testified at the preliminary hearing that M.R. said defendant threatened to kill her when he committed the other offenses on October 15, 2016. At trial, however, M.R. clarified that defendant did not make those statements on October 15, 2016.

The prosecutor argued M.R. testified defendant threatened her throughout the course of their relationship, "including specifically in July and through to October 15th and that she also received those threats by way of the defendant's brother," his niece, and a mutual friend. The prosecutor argued that count 4 should be amended to incorporate defendant's threats during that period because "[a]ll of these threats essentially conveyed the same information to [M.R.] – to not sleep at her apartment because defendant was saying he was going to kill her."

35.

Defense counsel objected and argued the expansion of the dates was overbroad and violated defendant's right to due process and notice, and the court already permitted M.R. to testify to his prior hearsay threats to show the effect of his statements on her conduct and not for the truth of the matter. Defendant further argued an amendment at such a late stage would confuse the jury as to what took place and give "undue importance" to M.R.'s testimony.

## G. *The Court's Ruling*

The trial court reviewed the provisions of section 1009 and noted that it allowed liberal amendments at any stage of the proceeding, even in the middle of trial. The court believed the information provided some "wiggle room" because it already alleged count 4 occurred "on or about October 15th, 2016," and the amendment would not violate the statute of limitations.

The court found good cause to grant the motion to amend based on M.R.'s trial testimony that "she was continually threatened by defendant since at least July 10th of 2016 either by him personally *or having received threats through third parties such as the gentleman's family* [and friends]," who conveyed his threats and warning that she should not "sleep at her apartment because defendant was saying he was going to kill her," and a third party could convey such threats to constitute a violation of section 422. (Italics added.)

The court found there had been sufficient notice to defendant "by the nature of the original pleadings" that stated count 4 was committed "on or about October 15th, 2016," and amended count 4 to read on or about and between July 1 and October 15, 2016. The jury was instructed consistent with the amendment. Defendant was convicted of this charge and the court stayed the term imposed for this count pursuant to section 654.

## H. *Amendment of the Information During Trial*

"Due process requires that 'an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken

36.

by surprise by evidence offered at his trial.'  [Citation.]  Thus, it is the rule that 'a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising out of the transaction upon which the commitment was based.'  [Citations.]"  (*People v. Graff* (2009) 170 Cal.App.4th 345, 360.)

"Notice of the specific charge is a constitutional right of the accused.  [Citation.] … The information plays a limited but important role – it tells a defendant what kinds of offenses he is charged with and states the number of offenses that can result in prosecution.  *However, the time, place, and circumstances of charged offenses are left to the preliminary hearing transcript.*  This is the touchstone of due process notice to a defendant.  [Citation.]"  (*People v. Jeff* (1988) 204 Cal.App.3d 309, 341–342, italics added.)

"The general framework within which criminal pleadings are amended is statutorily derived and has remained constant since 1911.  [Citation.]  Section 1009 authorizes amendment of an information at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination."  (*People v. Winters* (1990) 221 Cal.App.3d 997, 1005.)

Section 1009 states in relevant part:  "An indictment, accusation or information may be amended by the district attorney, and an amended complaint may be filed by the prosecuting attorney, without leave of court *at any time before the defendant pleads or a demurrer to the original pleading is sustained.  The court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings ….  An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination….*"  (Italics added.)

In addition, section 739 provides in part: "When a defendant has been examined and committed, … it shall be the duty of the district attorney of the county in which the offense is triable to file in the superior court of that county … an information against the defendant which may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed.…" " '[A]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense "arose out of the transaction which was the basis for the commitment" on a related offense. [Citations.]' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 903 (*Pitts*).)

"The same general rule holds where an amendment is concerned" under section 1009, which "preserves a defendant's substantial right to trial on a charge of which he had due notice. [Citation.] In other words, section 1009 protects a defendant's right to due process." (*Pitts, supra*, 223 Cal.App.3d at pp. 903–904.) "[A]n information need *not* notify a defendant of all the particulars of the crime charged. *That role is left to the preliminary hearing transcript.* Where … the particulars are *not* shown by the preliminary hearing transcript, the defendant is *not* on notice in such a way that he has the opportunity to prepare a meaningful defense." (*Id.* at p. 905.)

Section 1009 is also based on article I, section 14 of the California Constitution, so that " '[b]efore any accused person can be called upon to defend himself on any charge prosecuted by information, he is entitled to a preliminary examination upon said charge, and the judgment of the magistrate before whom such examination is held as to whether the crime for which it is sought to prosecute him has been committed, and whether there is sufficient cause to believe him guilty thereof. These proceedings are essential to confer jurisdiction upon the court before whom he is placed on trial.' [Citation.]" (*People v. Burnett* (1999) 71 Cal.App.4th 151, 165 (*Burnett*).)

The court's decision to permit an amendment of the accusatory pleading under section 1109 is reviewed for an abuse of discretion. (*People v. Arevalo-Iraheta, supra*, 193 Cal.App.4th at p. 1581.)

### I.    *Burnett, Domiguez, and Kellin*

"Many cases illustrate the rule that a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing ...." (*Burnett, supra,* 71 Cal.App.4th at pp. 165–167.)

#### 1.    Burnett

In *People v. Burnett, supra*, 71 Cal.App.4th 151, the defendant was charged with being a felon in possession of a firearm, identified as a .38-caliber revolver, alleged to have occurred on or about January 8, 1996. (*Id*. at pp. 155–156.) The preliminary hearing evidence showed one incident, described by two witnesses, that occurred on the alleged date with the .38-caliber revolver. (*Id*. at pp. 164–165.) At trial, the two witnesses testified consistent with the preliminary hearing evidence. However, a third witness testified that the defendant possessed a Ruger .357 magnum revolver on a different date. (*Id*. at pp. 156–158.) The trial court granted the People's motion to strike " '.38 caliber' " from the information, and the jury was given the unanimity instruction. In closing argument, the prosecutor said the evidence showed the defendant possessed two different guns, and he could be convicted based on either weapon as long as the jurors agreed which act the conviction was based on. (*Id*. at pp. 157, 169.) The defendant was convicted of possession. On appeal, the defendant argued he was convicted of an offense not shown by the preliminary hearing evidence based on possession of a .357 magnum revolver, in violation of section 1009 and his constitutional right to due process. (*Burnett*, at p. 164.)

*Burnett* reversed the defendant's conviction and held there was "no question that the evidence in this case showed two completely different incidents, involving two separate weapons," that could have supported two separate charges of possession of a

firearm by a felon, "if the prosecution had chosen to charge [the defendant] with two counts and the charge had been sustained after a preliminary hearing." (*Burnett, supra*, 71 Cal.App.4th at pp. 169–170.) However, the defendant was charged "with only one violation," and the preliminary hearing established a single incident with a .38-caliber revolver. While both the preliminary hearing and trial evidence involved revolvers, the trial testimony was that the defendant possessed the two different weapons at different times, and the trial evidence about the defendant's possession of a .357 magnum revolver "was never the subject of a preliminary hearing at which it could be determined whether there was probable cause to believe that offense had occurred." (*Id*. at p. 171, fn. omitted.)

> "No hint was given at the preliminary hearing that a different witness had seen [the defendant] in possession of a different firearm at a different time on the same date. The amendment of the information, combined with the prosecutor's argument at trial and the jury instructions, allowed the jury to convict [the defendant] solely on the basis of his possession of the gun observed by [one witness], even if it did not believe the testimony of [the other two witnesses]." (*Id*. at p. 170.)

*Burnett* held the issue was "*not* notice of each witness's testimony but notice of the offense being prosecuted." (*Burnett, supra*, 71 Cal.App.4th at p. 174.) While the court gave the unanimity instruction, the incident involving the .357 magnum revolver "could not legally form the basis of the conviction" if the jury relied on it. (*Id*. at p. 173.)

*Burnett* rejected the People's argument that the defendant did not suffer any prejudice from the amendment since his defense was to disclaim possession of any weapon, regardless of the type of gun. (*Burnett, supra*, 71 Cal.App.4th at pp. 176–177.) *Burnett* held the prosecution or conviction of an offense "different from and not transactionally related to the one shown by the preliminary hearing evidence" was clearly illegal, the defendant could not "constitutionally be prosecuted for or convicted of an offense not shown by the evidence at the preliminary hearing," and a prejudice analysis was not applicable. (*Id*. at pp. 178, 181.)

### 2. Dominguez

In *People v. Dominguez* (2008) 166 Cal.App.4th 858 (*Dominguez*), the defendant was charged in the complaint and information with the unauthorized use of a vehicle on or about and between October 16 and 18, 2006. (*Id*. at p. 861.) The preliminary hearing evidence showed the victim gave his car key to the defendant in September or October, so he could repair the vehicle. The defendant returned the key on the same evening. Several days later, on or about October 16, the victim discovered his car was missing and saw the defendant driving it a few days later. (*Id*. at pp. 861–862.) Prior to trial, the parties stipulated to amend the information to allege the offense occurred between October 16 and 19, 2006. (*Id*. at p. 862.) At trial, the victim testified defendant took the car without permission on October 9, 2006, and returned it later that evening. At the close of evidence, the court granted the prosecution's motion to amend the charge to "extend the date range within which the crime was alleged to have occurred. The court then instructed the jury that it could find [the] defendant guilty of vehicle theft or unauthorized use based upon either the October 9, 2006 incident in which [the] defendant took the car and said that he had used it to visit his family or the incident in which the car disappeared overnight on October 16, 2006, and [the] defendant was later seen driving it." (*Id*. at p. 866.)

*Dominguez* agreed with the defendant that his conviction violated due process since there was no evidence at the preliminary hearing that the defendant took the car without consent on October 9. The People conceded the error but argued it was harmless. (*Dominguez, supra*, 166 Cal.App.4th at p. 866.) *Dominguez* noted that *Burnett* found a prejudice analysis was irrelevant in a similar situation. (*Id*. at pp. 868–869.) *Dominguez* declined to decide whether the error was reversible per se or was subject to harmless review, because "[u]nder either analysis, the judgment must be reversed" (*id*. at p. 870) since it was reversible error to allow the jury to base its guilty verdict on the earlier incident, which was "not asked about nor … mention[ed]" at the preliminary hearing.

(*Id.* at p. 866; see also *People v. Kellin* (1962) 209 Cal.App.2d 574, 575–576 [unconstitutional amendment to information charged defendant with a crime "unrelated to or unconnected with the transaction which was the basis of the commitment order" and "not shown by the evidence at the preliminary hearing"].)

**J.     *Analysis***

On appeal, the People argue the amendment to count 4 "did not alter the specific statute [defendant] was accused of violating, the alleged conduct underlying the charge, the number [of] charges against him, or his defense that [M.R.] fabricated the allegations against him." The People also assert the prosecutor's motion to amend count 4 was based on defendant's direct threats that he personally made to M.R. that he would kill her, and was consistent with Deputy Vega's testimony at the preliminary hearing, and only changed the dates of those threats. The People argue that defendant's threats to kill M.R. that were conveyed through third parties were only admitted "for the limited purpose of showing [M.R.'s] sustained fear of defendant, which culminated in the abandonment of her apartment."

The People's arguments about the basis for the amendment are undermined by the record. First, M.R. testified that after the July 2016 domestic violence incident, and before defendant committed the charged offenses on October 15, 2016, she stopped sleeping in her apartment on Stobaugh Street because of warnings from defendant's brother, his niece, and a mutual friend that defendant said he was going to kill her, and they warned her not to sleep at her apartment.

After M.R. completed her testimony, the prosecution's written motion to amend count 4 stated the reason for the amendment:

> "During the course of [M.R.'s trial] testimony, she advised defendant did
> not actually tell her he would kill her if she called the police *on* October 15,
> 2016. [M.R.] testified she was continually threatened by defendant since at
> least July 10, 2016 either by him personally *or having received threats
> through third parties*. [M.R.] testified that the threats received by third

42.

parties included threats received from defendant's brother, Jose Alcala, in person; threats received from defendant's niece during phone conversations; and threats received from 'George' via Facebook Messenger. All of these threats essentially conveyed the same information to [M.R.] – *to not sleep at her apartment because defendant was saying he was going to kill her*." (First italics in original, second and third italics added.)

The prosecution's motion to amend count 4 was thus based on the threats conveyed to M.R. by the three people after the July 2016 incident, and not on threats that defendant made personally and directly to M.R.

The People's arguments are further undermined by the court's stated reasons to grant the amendment to count 4. The court found good cause based on M.R.'s trial testimony that "she was continually threatened by defendant since at least July 10th of 2016 either by him personally *or having received threats through third parties such as the gentleman's family*" (italics added) who conveyed his threats to her, along with the warning that she should not "sleep at her apartment because defendant was saying he was going to kill her." The court found that a third party could convey such threats to constitute a violation of section 422, criminal threats.

Moreover, the prosecutor used closing argument to elect that count 4 was based on the threats conveyed from defendant's brother, his niece, and the mutual friend:

"… I'm not required to prove that the crime took place on exactly the date specified in the Information which has been amended. So currently the Information reads the date of the offense for Charge Number 4 is July 1st, 2016, through October 15, 2016. And if you recall, [M.R.] testified, one, that … defendant habitually threatened to kill her and that he does, in fact, hurt her, oftentimes, in conjunction with these threats to kill her. *But [M.R.] also testified about … [t]he defendant's brother … telling her you can't stay at that house. You've got to leave. He's saying he's going to kill you. It's not safe for you to stay there. He's saying he's going to kill you.*

*"You've heard [M.R.] say she's also heard this from the defendant's niece. You've heard [M.R.] say she also heard this from a mutual friend named George. You've got to get out of that house. He's telling everyone he's going to kill you. What did [M.R.] do? She quit sleeping in the house, and I think that was specifically what she testified to in regards to the*

43.

*defendant's brother. Don't sleep there. He's going to kill you. And so she heeded that advice. Why did she heed that advice? Because she thought the defendant was going to kill her and that's why she was so scared of him on October 15th, 2016, when he kicked that door open."* (Italics added.)

The prosecutor reviewed the elements of section 422 and argued defendant intended for his threats to be communicated to M.R., and that was shown by "those third-party threats, the threats that were communicated – the threats that were made by the defendant but communicated by his brother, George, and I think it was a niece…. I have to prove to you that the defendant intended those threats to be communicated…." "[Defendant] communicated the threat to friends and family members to make sure [M.R.] knew he was going to kill her. He was making sure those threats were being communicated to her, and "[s]he was in sustained fear because she stopped sleeping in the apartment and stayed at other places with her children.

The entirety of the record thus shows the court granted the motion to amend based on M.R.'s testimony about the threats conveyed to her by the three people, and the prosecutor elected to rely on those third party threats to argue that they satisfied the elements required to prove a violation of section 422, criminal threats.

### 1. The Amendment Modified the Nature of Count 4

*Dominguez, Burnett,* and *Kellin* held the defendants in those cases did not receive notice of the charged offenses because the amendments extended the time frames for the charges, and there was no evidence to support those amendments at the defendants' preliminary hearings. The amendment in this case resulted in the similar situation. The court abused its discretion because the amendment changed the entire nature of the violation of section 422 previously alleged in the complaint and information and, more importantly, established by Deputy Vega's testimony at the preliminary hearing.

The court improperly granted the motion to amend count 4 because the newly-alleged offense was not supported in any way by Deputy Vega's preliminary hearing testimony that was limited to what happened on the day that defendant forced open the

44.

door, took her cell phone, assaulted her, and violated the protective order. The amendment to count 4 did not simply conform to the trial evidence about the particular day that defendant threatened to kill M.R. if she called the police about breaking the door and assaulting her. Instead, the amendment changed the alleged violation of section 422 from a discrete threat that occurred at the same time he committed the charged offenses of burglary, robbery,[18] infliction of corporal injury, and violation of a restraining order, to a continuous course of conduct of threats to kill her that were made over a three-month period.

In addition, the amendment changed count 4 from a single incident where defendant directly threatened M.R. that he was going to kill her, to threats that he made in the presence of three different parties – defendant's brother, his niece, and a mutual friend. M.R. testified these three people conveyed defendant's threats to her and warned her that she should not stay at her apartment anymore, and these threats were the reason she stopped sleeping at her apartment. As a result, defendant was prosecuted for an offense that was not transactionally related to the evidence at the preliminary hearing.

### 2. The Date of the Offense

The court granted the prosecution's motion to amend because it found the complaint and information gave some "wiggle room" about the date of count 4, based on the allegation that defendant made the criminal threats "on or about October 15, 2016." On appeal, the People similarly assert the amendment "only changed the date that the threats were alleged to have occurred which was … not material to the offense."

"The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where the time is a material ingredient in the offense."

---

[18] The complaint and information charged defendant with count 1, robbery, based on M.R.'s testimony that defendant took her cell phone from her and left the apartment with it. He was found not guilty of that offense.

45.

(§ 955.)  This means that "when it is charged that an offense was committed 'on or about' a named date, the exact date need not be proved unless the time 'is a material ingredient in the offense' [citation], and the evidence is not insufficient merely because it shows that the offense was committed on another date.  [Citations.]"  (*People v. Starkey* (1965) 234 Cal.App.2d 822, 826–827; see *People v. Barnett* (1946) 27 Cal.2d 649, 658.)

In this case, however, the amendment did not simply conform count 4 to the trial evidence about the date of the offense.  Instead, it changed the entire nature of the charge from a direct threat made by defendant to M.R. at the time he committed the other charged offenses, to a continuous course of conduct based on threats conveyed from defendant through three people over three months, and the amendment was not supported in any way by the preliminary hearing evidence.

Based on the entirety of the record, we are compelled to reverse defendant's conviction in count 4 for committing criminal threats "on or about and between July 1, 2016 and October 15, 2016."  As shown by the above cases, "even where the prosecution complies with the necessary procedures and no specific prejudice is shown, appellate courts are compelled to reverse convictions where substantial evidence was presented at trial that did not correspond to the charges established at the preliminary hearing. [Citations.]"  (*People v. Graff, supra*, 170 Cal.pp.4th at p. 362.)

As noted in *Dominguez*, there is a division of authority as to whether this type of error is reversible per se as in *Burnett* or is subject to subject to harmless error review. (*Dominguez, supra,*166 Cal.App.4th at p. 870.)  As in *Dominguez*, we need not address the issue because defendant's conviction in count 4 must be reversed under either standard since there was no valid alternative basis for the verdict.  (*Ibid*.)[19]

---

[19] The record fails to explain why the prosecutor moved to amend count 4, the criminal threat charge in the information, given M.R.'s trial testimony about a different threat that defendant made when he broke into her apartment on October 15, 2016.  M.R. testified at trial that after defendant forced open the door and took her cell phone, he asked why she was not happy with him.  M.R. said she had no "liberty" when she was

We thus reverse defendant's conviction in count 4 for criminal threats, and order the term imposed and stayed stricken.[20]

## III. Admission of A.C.'s 911 Call

Defendant next argues the court abused its discretion when it admitted the recording of the 911 call placed by A.C. on October 15, 2016, the day of the charged offenses, where she reported that defendant had broken down the door to M.R.'s apartment and was beating her. Defendant argues A.C.'s statements on the 911 call constituted inadmissible double hearsay because she never saw defendant arrive at M.R.'s apartment, she was conveying information from her mother, and neither of them knew what was going on inside the apartment.

### A. *Background*

The prosecution moved to introduce the recording of A.C.'s 911 call on October 15, 2016, the day of the charged offenses, and argued A.C.'s statements to the dispatcher were admissible as spontaneous declarations under Evidence Code section 1240 because she made the statements under stress and there was panic in her voice. The prosecutor further argued there was no double hearsay because A.C. placed the 911 call as the interpreter for her mother to convey the emergency information in English.

---

with defendant. She further testified that defendant said that "if he's going to go to jail, that he might as well make it worth it." M.R. believed he was threatening her life with this statement. Defendant blamed her for putting him in jail after the July 2016 incident, and said, " '[Y]ou're going to pay for this ….' " It would appear the prosecutor could have relied on this testimony to support count 4 without moving to amend the information. We cannot find that the jury might have convicted defendant of count 4 based on this testimony, however, given the prosecutor's clear election in closing argument that the criminal threats charge was based on the three threats conveyed to M.R. between July and October 2016.

[20] Given our reversal of count 4, we need not address defendant's alternative issue that his criminal threats conviction must be reversed because the court failed to instruct the jury with the unanimity instruction.

Defense counsel replied the spontaneous declaration exception did not apply because A.C. did not have personal knowledge of any of the information she gave to the 911 dispatcher, she was not reporting on her own perceptions, she was repeating her mother's statements, and her mother's statements were also hearsay because did not see what happened.

The court held A.C.'s statements to the 911 operator were admissible, the circumstances of the call were relevant for the jury to determine the weight of the evidence, and the call did not amount to double hearsay because A.C. acted as the interpreter for her mother.

During trial, just before the 911 call was played for the jury, defense counsel again raised hearsay objections because Maria testified that she only saw defendant push open the door and that event was not exciting enough to support a spontaneous declaration. The court denied the motion and agreed with the prosecutor that Maria testified that she saw defendant use both hands to push open the door, and she was fearful about what was going to happen.

**B.    *Spontaneous Statements***

The spontaneous statement exception to the hearsay rule provides:  "Evidence of a statement is not made inadmissible by the hearsay rule if the statement:  [¶]  (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) was made spontaneously while the declarant was under the stress of excitement caused by such perception."  (Evid. Code, § 1240.)

"[T]he basis for the circumstantial trustworthiness of spontaneous utterances is that in the stress of nervous excitement, the reflective faculties may be stilled and the utterance may become the instinctive and uninhibited expression of the speaker's actual impressions and belief."  (*People v. Farmer* (1989) 47 Cal.3d 888, 903, disapproved on other grounds in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6.)

" 'To be admissible, "(1) there must be some occurrence startling enough to produce … nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it." '  [Citations.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 751–752, abrogated on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.)

"[A] hearsay statement, even if otherwise spontaneous, is admissible only if it relates to an event the declarant perceived personally.  Otherwise, the statement would be hearsay on hearsay and admissible only if each layer of hearsay separately met the requirements of an exception to the hearsay rule.  [Citation.]" (*People v. Phillips* (2000) 22 Cal.4th 226, 235.)  In a multiple, "nested" hearsay situation, the multiple hearsay is admissible only "if each hearsay layer separately meets the requirements of a hearsay exception.  [Citation.]" (*People v. Arias* (1996) 13 Cal.4th 92, 149; *People v. Roldan* (2005) 35 Cal.4th 646, 714, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.)

" 'Whether the requirements of the spontaneous statement exception are satisfied in any given case is, in general, largely a question of fact.  [Citation.]  The determination of the question is vested in the court, not the jury.  [Citation.]'  [Citation.]  The trial court's determination of preliminary facts will be upheld if supported by substantial evidence.  [Citation.]  However, '[w]e review for abuse of discretion the ultimate decision whether to admit the evidence.'  [Citation.]  In … determining whether the requirements of the spontaneous statement exception are satisfied, the court ' "necessarily [exercises] some element of discretion ...."  [Citation.]  [¶]  Because the second requirement relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines

whether this requirement is met [citation].'  [Citation.]" (*People v. Ramirez* (2006) 143 Cal.App.4th 1512, 1523.)

### C. *Maria's statements to A.C.*

Defendant is correct that A.C.'s statements on the 911 call potentially involved multiple levels of hearsay because she was relating what her mother told her.  We thus begin with whether Maria's statements to A.C. satisfied the preliminary facts to admit them under Evidence Code section 1240.

Maria's statements to A.C. to call 911 were made immediately after she saw defendant force open M.R.'s door and were admissible as spontaneous declarations because she was still under the stress of nervous excitement about what she had just seen. Maria knew about M.R.'s fear of defendant and the prior incidents and realized the potential seriousness of the situation.

M.R. testified that Maria and A.C. were her friends, and she had confided in both of them about her problems with defendant.  M.R. went to their apartment for help immediately after the July 2016 prior incident, and Maria called 911 for her.  M.R. testified that when she returned to her apartment on October 15, 2016, she told A.C. and Maria that she was there with the children.  A.C. called M.R. every 30 minutes to check on her safety.

Maria testified she was outside her own first floor apartment and saw defendant arrive in the complex.  She saw him go upstairs to M.R.'s second floor apartment, push down the door with his hands, and go inside.  Maria testified she did not see what happened inside M.R.'s apartment, but she immediately tried to find someone to help M.R.  A.C. testified that Maria rushed into their apartment, and she was "screaming" in Spanish that defendant "was killing" M.R., and that A.C. had to call 911.  A.C. immediately called 911 as her mother talked to her in Spanish.

50.

Maria's spontaneous statements to A.C., and her description about seeing defendant knock down M.R.'s door, were made under the stress of excitement and with the knowledge about defendant's prior violent acts against M.R.

Defendant argues Maria's statement to A.C. that defendant was "killing" M.R., was not admissible as a spontaneous statement because Maria did not see what happened in the apartment, she was not a percipient witness, and her statement did not purport "to narrate, describe, or explain an act, condition, or event perceived by the declarant." (Evid. Code, § 1240, subd. (a).)

The trial court acknowledged this disparity but held it was a matter that went to the weight and not the admissibility of Maria's statements. However, the court should have limited A.C.'s testimony to Maria's statements that were based on what she had actually perceived – that she saw defendant arrive, he was holding a beer can, he leapt up the staircase, and forced open the door to M.R.'s apartment. Maria did not testify that she heard shouting, screaming, or other sounds from M.R.'s second floor apartment that meant defendant was attacking M.R. The record infers that Maria likely assumed the worst given her knowledge of defendant's prior conduct.

In any event, the court's admission of Maria's statement to A.C., that defendant was "killing" M.R., was necessarily harmless under any standard since Maria admitted she was not in M.R.'s apartment and did not know what happened after defendant forced open the door. In addition, the jury was fully apprised of what happened in the apartment based on M.R.'s testimony about the assault, and Deputy Vega's observations of her visible injuries and the broken doorframe, and both witnesses were subject to cross-examination. (*People v. Page* (2008) 44 Cal.4th 1, 42.)

**D.      *Carranza's Statements to the 911 Dispatcher***

We next examine A.C.'s statements to the 911 dispatcher. A.C. testified her mother rushed into their apartment, she was "screaming" in Spanish that defendant "was killing" M.R., and that A.C. had to call 911. A.C. testified that she did not see what

51.

going on in M.R.'s apartment, but she immediately called 911 and relayed what her mother was telling her in Spanish. A.C. testified that she did not see defendant arrive in the apartment complex, force open M.R.'s door, or what happened inside, but she was reporting what her mother was screaming about in Spanish.

A.C.'s statements to the 911 operator were properly admitted.

### 1. Translation of Martinez's statements

First, "translation simply does not add a layer of hearsay when a translator acts as a 'language conduit' so as to cause the statement to be fairly attributable to the declarant." (*Correa v. Superior Court* (2002) 27 Cal.4th 444, 455 (*Correa*).) *Correa's* " 'language-conduit' " theory calls for "a case-by-case determination whether, under the particular circumstances of the case, the translated statement fairly may be considered to be that of the original speaker." (*Id*. at p. 457.) These factors include " 'which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.' [Citation.]" (*Id.* at p. 458.)

" 'Absent a motive to mislead' … or to 'distort, or some other indication of inaccuracy, [citations], when persons speaking different languages rely upon a translator as a conduit for their communication, the statements of the translator should be regarded as the statements of the persons themselves without creating an additional layer of hearsay.' [Citations.]" (*Correa, supra*, 27 Cal.4th at p. 457.) The court's determination whether to admit a "contemporaneously translated statement is to 'consider on a case-by-case basis whether the translated statements fairly should be considered the statements of the speaker' [citation] …." (*Id*. at pp. 458–459.)

A.C. testified that she reported to the 911 operator what her mother was telling her in Spanish, and her mother continued to relate information in Spanish during the

telephone call.[21]  There is no evidence that A.C. distorted her translation of Maria's frantic report or intended to mislead the 911 operator.  Indeed, both A.C. and Maria testified to the sequence of events leading to the 911 call and, as discussed above, M.R. testified that defendant broke down her door, and Deputy Vega saw the broken doorframe, consistent with their account.

## 2. Reporting Maria's Statements

Next, while A.C. was not a percipient witness to defendant's arrival and did not see him break down M.R.'s door, the "act' or "event" made under the stress of excitement for purposes of a spontaneous declaration may be another's statement (*People v. Arias*, *supra*, 13 Cal.4th at p. 150), or the declarant can be "a witness to what [another person was] saying.  [Citation.]"  (*People v. Roldan*, *supra*, 35 Cal.4th at p. 714.)  A.C. called 911 in reaction to the stress of the excitement when Maria rushed into their apartment and was screaming about defendant and M.R.  As to personal knowledge, A.C. was well aware of the background information she gave to the 911 dispatcher about the July 2016 incident when defendant was arrested after taking his younger child and leaving his gun in M.R.'s apartment, that he had just been released from custody, and that M.R. was afraid of him.[22]

While A.C. also related information to the 911 dispatcher that her mother did not see, any error is harmless since A.C. and Maria testified before the jury that they did not see what happened in the apartment, and both M.R. and Deputy Vega testified about the circumstances of the charged offenses.

---

[21] Maria testified at trial through a Spanish translator.

[22] At trial, A.C. testified that during the July 2016 incident, she saw defendant run through the apartment complex with the younger child, and M.R. later told her that defendant had a gun that day.

### 3. A.C.'s Fear of Defendant

Finally, A.C.'s statements to the 911 operator also constituted spontaneous declarations based on her own fear from learning defendant was nearby and had already used force to break down M.R.'s door. At trial, A.C. testified she feared for her own safety because defendant had just gotten out of jail for kidnapping his child in July 2016, and mutual friends told her that defendant accused her of being M.R.'s lover and helped her lie about him so he would go to jail, "so I was not going to be out there confronting him."

## IV. Discovery – Contact Information and Pretrial Statements

Defendant next contends the prosecution committed multiple discovery violations by belatedly disclosing material evidence during trial, these belated disclosures violated his substantial rights, and the court abused its discretion when it failed to sanction these discovery violations by excluding witnesses or giving appropriate instruction. Defendant argues his convictions must be reversed because the admission of the evidence resulting from belated discovery was prejudicial.

We will address defendant's claims about the alleged discovery violations as follows:

(1) the prosecution failed to timely disclose the contact information for M.R. and Maria and their pretrial statements;

(2) the court allowed M.R. to testify that her son had PTSD when the prosecution failed to timely disclose this evidence to the defense; and

(3) the prosecution failed to timely disclose the clinic's report about the nurse's examination of M.R. and allowed the prosecution to reopen to call the nurse to testify.

Our review of the record shows that beginning on the first day that defendant's case was assigned to a courtroom, defense counsel repeatedly claimed the prosecutor violated discovery and failed to disclose material evidence. Our review also shows that

54.

most of the defense objections were meritless, and the few discovery issues were quickly resolved and did not result in prejudice to the defense.

## A. *The Court's Rulings on Discovery Violations*

"Section 1054.1 provides, in pertinent part, that the 'prosecuting attorney shall disclose' certain types of material to defense counsel if the evidence 'is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies.'  Such disclosure 'shall be made at least 30 days prior to the trial' *or as soon as the prosecution learns of the documents or information*.  (§ 1054.7.)" (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467, italics added (*Mora*).)

"Appellate courts generally leave discovery matters to the discretion of the trial courts.  [Citation]  To set aside a trial court's discovery decision, an appellate court must find an abuse of discretion.  [Citation.]  A reviewing court may not substitute its judgment for that of the trial judge, and discretion is abused only if the trial court's ruling exceeds the bounds of reason, all of the circumstances being considered.  [Citation.]  This deference extends to a trial court's denial of a motion for a mistrial based on the prosecutor's violation of the discovery statutes.  [Citation.]" (*People v. Hughes* (2020) 50 Cal.App.5th 257, 283.)

"A violation of section 1054.1 is subject to the harmless-error standard set forth in *People v. Watson*[, *supra*,] 46 Cal.2d [at p.] 836." (*People v. Verdugo* (2010) 50 Cal.4th 263, 280.)  However, if a discovery violation implicates a defendant's constitutional rights, a reviewing court evaluates whether the error is harmless beyond a reasonable doubt as described in *Chapman v. California* (1967) 386 U.S. 18, 24.  (*People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)

In this section, we will review defendant's repeated assertions that the prosecution violated discovery by failing to timely provide contact information and pretrial statements from M.R. and Maria.

**B.**     *The Preliminary Hearing – M.R.'s New Address*

On November 22, 2017, defendant's preliminary hearing was held at the Lamont branch of the superior court.  Defendant was represented by Laurie Mason, a deputy public defender.  After defendant was held to answer, the prosecutor raised an issue about the confidentiality of M.R.'s new address:

> *"[M.R.'s] new address has been provided in discovery*; however, we would ask that counsel keep that confidential from her client.  The victim has expressed concerns over her safety and has tried to do everything she could to keep that address confidential from … defendant and his family."
> (Italics added.)

Defense counsel said it was not an appropriate request to keep the address confidential because the charged offenses occurred over a year ago, and there was no evidence of anything else happening in the interim.

The court stated it would grant the prosecutor's request "subject to the defense right to make a motion with the court to obtain the address if it becomes necessary and appropriate [for the] representation of the defendant."

**C.**     *Pretrial Discovery Motions*

Prior to trial, defendant filed motions in limine that requested, among other things, discovery of the names and contact information for potential prosecution witnesses, along with any statements by the witnesses, pursuant to section 1054.1, subdivision (a); disclosure of oral statements from witnesses made before or during trial to the prosecutor's office; for the prosecutor to turn over all statements of witnesses who had been interviewed and were going to be called to trial; and for the court to exclude the trial testimony of any witness or the introduction of any evidence that had not been disclosed to the defense in the form of written statements pursuant to sections 1054.1 and 1054.7.

The prosecution's trial brief identified M.R., A.C., and Maria as prospective witnesses.

**D.** *First Day of Trial – the Rental Agreement and Clinic's Report*

On Thursday, May 10, 2018, defendant's trial was assigned to a courtroom and began with motions. Ms. Austin of the public defender's office represented defendant.

The court asked if there were any medical records for the charged offenses. The prosecutor said there was a report from Clinica Sierra Vista.[23] Defense counsel said she did not have that report yet. The prosecutor explained that in December 2016, two months after the charged offenses, M.R. went to the sheriff's substation in Lamont, met with a deputy, and turned over her new rental contract and the report from the clinic where she was treated after the charged offenses. The deputy prepared a report about this meeting and listed these two documents as evidence, the documents had been "booked" and logged into the "property" room, and they had been available for inspection. The prosecutor said Deputy Vega, the investigating officer for the trial, was trying to retrieve both documents at that time, and they believed the documents were still in the property room at the Lamont substation.

The court asked the bailiff and clerk to contact the Lamont substation to expedite the request. The clerk reported it was not clear if the documents were in the court's exhibit room or the sheriff's property room in Lamont. The prosecutor said she would call the sergeant in Lamont and find out.

Defense counsel objected because the prosecution had violated discovery and failed to produce two major pieces of evidence. The prosecutor disagreed with the defense claim about a discovery violation:

> "Your Honor, just to be clear there is no outstanding discovery. This information has been contained in reports dated December 6th, 2016, and it was provided [to the defense] when this case was filed. These items have

---

[23] In issue VII, *post*, we will address the court's admission of the clinic's report and the nurse's testimony; we include these exchanges between the court and the parties as relevant to the prosecution's disclosure of M.R.'s new rental agreement and contact information.

always been booked in evidence. [¶] If Defense Counsel – whether it be Ms. Mason out at Lamont or Ms. Austin in Bakersfield – wanted to see it, they were free to make an appointment at any time to view these items. These items have – copies of these items have never been requested from me regardless of it being in an informal discovery request or in a formal discovery request. [¶] So this is not some kind of new or late discovery.This is information that has been named in the police reports, filed with the original file."

Defense counsel admitted she received the investigative report that identified the two documents, but argued the prosecution violated discovery by failing to provide those two documents in response to the defense's discovery requests, particularly since the prosecutor now admitted she did not know where the documents were, and wondered what else the prosecution had failed to produce.

Defense counsel argued it was crucial to receive the rental agreement because it could show defendant was lawfully at the apartment at the time of the charged offenses. The prosecutor replied that defense counsel knew the rental agreement was not for the apartment that M.R. was living in when defendant committed the charged offenses in October 2016, since Deputy Vega's report stated M.R. gave him the rental agreement for her new address in December 2016.

The court stated M.R.'s current residence was irrelevant since she was protected by a restraining order, but they would get the two documents that morning.

The court determined the only outstanding discovery was for "one piece of paper from Clinica Sierra Vista" since the new rental report was irrelevant. The court directed defense counsel to review the clinic's report once it was located and determine whether the report would affect the possible disposition of the case.

As the hearing continued, the court was advised that the two documents had been booked into the sheriff's property room at the Lamont substation, and then transferred to the sheriff's main property room in Bakersfield. Shortly afterward, the two documents were delivered to the court, and copies were given to both attorneys. The court ordered the parties not to read M.R.'s new address on the record.

58.

## E.      *First Day of Trial – Request for Pretrial Statements*

As the hearing continued on May 10, defense counsel asked if the prosecution had any additional statements from M.R., A.C., Maria, or Gabriel L.  The prosecutor said she did not have any new statements from the witnesses, but that "this morning [M.R.] said her [youngest child] was diagnosed with PTSD."  Defense counsel did not object or request disclosure of further information.[24]  The court adjourned for the day.

## F.      *Maria's Contact Information*

The court reconvened on Monday, May 14, 2016, and continued to review motions.  When it reviewed the admissibility of A.C.'s 911 call, the prosecutor stated that A.C. related information provided by her mother, Maria.

Defense counsel said she did not have any pretrial statements from Maria or her contact information.  The prosecutor said there were no pretrial investigative statements obtained from Maria or A.C., and she was going to rely on the information in the 911 calls about what they allegedly saw at the time of the charged offenses.  The prosecutor further stated that they obtained a follow-up statement from M.R. on the day of defendant's preliminary hearing and provided discovery of that information to defendant's public defender at that time.

Defense counsel acknowledged that she received M.R.'s follow-up statement, but she did not have contact information for Maria or details about what Maria saw that day.  The prosecutor again said she did not have any pretrial statements from Maria, but she had her contact information and would give it to defense counsel.  Counsel immediately objected to another discovery violation.  The prosecutor replied that she did not have Maria's contact information at the time of the preliminary hearing.

The court directed the parties to meet and confer to settle any outstanding discovery issues about witnesses.

---

[24] In issue V, *post*, we will address the admission of M.R.'s testimony about the child's PTSD

**G.    *M.R.'s Contact Information***

On Wednesday, May 16, 2018, the court addressed the admissibility of the prior domestic violence incidents.  During that hearing, defense counsel stated the prosecution failed to provide discovery of M.R.'s contact information and her pretrial statements that her child had PTSD.

The prosecutor replied that defense counsel's complaint was "mind boggling.  The prosecutor explained that when defendant's trial was assigned to a courtroom on May 10, M.R. was present and was ready to testify.  The prosecutor told M.R. that she could leave because they were reviewing motions.  M.R. asked the prosecutor if her children were going to be called as witnesses, and the prosecutor said probably not since they had been unable to give statements.

> "And at that point [M.R.] says, 'Well [the younger child has] been diagnosed with PTSD.'  [¶]  So I did what I'm supposed to do ethically and under the law.  When [M.R.] told me that on the day, we got sent out.  I told [defense counsel] that."

Defense counsel did not object or refute the prosecutor's timeline.

The prosecutor said her only other contact with M.R. was before the preliminary hearing in November 2017, the notes from that interview were given to defendant's public defender at that time, and there were no other pretrial statements obtained from her.

**H.    *Defendant's Supplemental Motion – Maria's Contact Information and M.R.'s Pretrial Statements***

On May 17, 2018, defendant filed supplemental opposition to A.C.'s 911 call.  Defendant's motion also asserted Maria should be precluded from testifying because the prosecution belatedly identified her and provided her contact information after the trial had started.

In that same motion, defendant requested discovery of all pretrial statements made by M.R. to the prosecutor's office or to the victim advocate, particularly her claim that one of the children suffered from PTSD.

**I.**     ***The Prosecutor Obtains New Contact Information for M.R. and A.C.***

On Thursday, May 17, 2018, the court continued to address the motions in limine. Defense counsel said she received the contact information for Maria on Monday afternoon, May 14. Counsel did not have contact information for M.R., and the defense investigator determined M.R. had moved and could not be located.

The prosecutor stated that at 9:31 a.m. that morning, she had received A.C.'s address and telephone number. The prosecutor contacted A.C. at 10:30 a.m. and asked if M.R. was living with her; A.C. said yes. The prosecutor further stated that during the court's morning break, she told defense counsel that she had just obtained the updated contact information for A.C. and learned that M.R. was living with her.

Defense counsel did not dispute the prosecutor's statements but requested the contact information for M.R. and A.C. be provided "in written form … just as I received Maria's information." The prosecutor agreed.

The prosecutor again said she did not obtain pretrial statements from Maria or A.C., and she was only going to question them based on the information on A.C.'s 911 call on the day of the charged offenses as she relayed what Maria told her.

Defense counsel again stated she did not have any pretrial statements from Maria about the 911 call, and Maria was not listed in any police report. The prosecutor repeated she never obtained a pretrial statement from Maria and was only relying on information contained in A.C.'s 911 call.

The court held A.C.'s 911 call was admissible.

After the ruling, defense counsel asked if M.R. had made any statements to the victim advocate's office. After a brief discussion about the issue, the court placed a telephone call to the victim advocate in the presence of the parties. In response to the

court's questions, the victim advocate stated she never asked M.R. about the charged offenses and M.R. never talked about what happened.

**J.** *Analysis – Contact Information*

On appeal, defendant asserts the prosecutor repeatedly violated discovery by failing to timely provide the contact information for M.R. and Maria along with their pretrial statements.

These arguments are meritless based on the review of defense counsel's objections and the prosecutor's responses. The prosecutor stated that in December 2016, M.R. met with a deputy and gave him the new rental agreement and the clinic's report from Clinica Sierra Vista, a supplemental investigative report was prepared and given to the defense, and the investigative report stated that both documents were received and booked into evidence. At the time of the preliminary hearing in November 2017, the prosecution gave M.R.'s contact information to the defense, along with the supplemental investigative report about the interview with M.R. prior to that hearing.

Defendant asserts the prosecution violated the defense discovery request for all relevant documents by failing to produce the new rental agreement and the clinic's report, even though defense counsel acknowledged receipt of the supplemental investigative report that identified those documents. To the extent that the prosecutor failed to comply with the defense discovery request, both documents were produced on the first day of trial. As the court later noted, the new rental agreement was irrelevant since M.R. moved after the charged offenses and defendant never lived at that address, and the record implies that M.R.'s "new" address in December 2016 was the same address given to the defense at the time of the preliminary hearing in 2017.

As for M.R.'s whereabouts at the time of trial, the prosecutor immediately advised defense counsel when she learned that A.C. and M.R. were living together. Defense counsel did not dispute that the prosecutor had given this information to her during the court's break but demanded the contact information in writing.

The entirety of the record thus shows that the prosecution provided M.R.'s contact information to the defense at or immediately after the time that the information was obtained.

As for Maria's contact information, it appears that neither party realized that Maria was going to be a witness until sometime after the preliminary hearing and before the start of trial. The record again shows that the prosecutor gave Maria's contact information to the defense as soon as she obtained that information.

Finally, defense counsel repeatedly asserted the prosecutor had failed to turn over investigative or pretrial statements obtained from M.R. and Maria. The record again refutes this claim. Defense counsel never refuted the prosecutor's explanation that she had turned over the supplemental investigative reports about M.R.'s additional statements shortly after the reports were prepared in December 2016 and November 2017. During the motions in limine, the prosecutor stated that she had never obtained any pretrial statements from Maria. As we will discuss in issue V, *post*, the prosecutor immediately informed defense counsel about M.R.'s statement on the first day of trial, that her child had been diagnosed from PTSD.

As noted above, the prosecution must comply with discovery requests at least 30 days prior to trial "*or as soon as the prosecution learns of the documents or information*. (§ 1054.7.)" (*Mora*, *supra*, 5 Cal.5th at p. 467, italics added.) The prosecutor provided the contact information from M.R. and Maria as soon as she received that information, along with the pretrial statements from M.R., and she never obtained any pretrial statements from Maria. Since disclosure was made immediately after the prosecutor obtained new information, there was no discovery violation. (*Id*. at p. 468.)

V.     **Discovery – M.R.'s Testimony About the Child's PTSD**

We next examine defendant's arguments that the prosecution failed to timely disclose M.R.'s statements that her child had PTSD, and the court should have excluded M.R.'s testimony about this subject because of the discovery violation.

**A.** *The Prosecutor's Advisement About the PTSD Diagnosis*

As explained in issue IV, *ante*, during the court's review of motions on May 10, 2018, the first day of trial, the prosecutor stated she did not have any new statements from the witnesses, but that "this morning [M.R.] said her [youngest child] was diagnosed with PTSD." Defense counsel did not object or request disclosure of the information, and the court adjourned for the day. On Wednesday, May 16, 2018, defense counsel stated the prosecution failed to provide discovery of M.R.'s contact information, or her pretrial statements that her child had PTSD. The prosecutor reminded defense counsel that on the first day of trial, the prosecutor personally advised counsel about this information immediately after M.R. disclosed it on the first day of trial. Defense counsel did not refute the prosecutor's timeline.

Also as noted above, on May 17, 2018, defendant again requested discovery of all pretrial statements made by M.R. to the prosecutor's office or to the victim advocate, particularly her claim that one of the children suffered from PTSD, even though the prosecutor had already told the court that she had disclosed M.R.'s statement about the child's PTSD and did not have any additional statements from her.

**B.** *M.R.'s Initial Testimony About the Child's PTSD*

On May 22, 2018, the prosecution began the introduction of evidence with M.R.'s testimony before the jury.

On cross-examination, defense counsel asked M.R. a series of questions that raised for the first time the situation that M.R. went to the home of defendant's parents to confront him in November 2017, before he was arrested in this case. In response to defense counsel's questions, M.R. testified she learned that defendant was staying with his parents, she went to the parents' house in November 2017 around midnight, a man went with her, she did not ask defendant for money, and she went there to tell him to "sober up, straighten up, your kids miss you," and the children needed him. Defense

counsel asked if she wanted defendant to have a positive relationship with the children. M.R. said yes, because he had supervised visitation.

On redirect examination, the prosecutor asked M.R. to explain why she went to talk to defendant that night. M.R. said she wanted to talk to defendant about getting sober and attending his supervised visits because the children missed and needed him.

> "[The prosecutor]. You said something about how you wanted the defendant to start participating, going to the visits with his kids. [¶] Why do you want that?
>
> "A. To begin with, [my younger child is] actually being treated for post traumatic stress disorder."

Defense counsel immediately objected and asked for a sidebar.

### C. *The Evidentiary Hearing About the PTSD Evidence*

The court excused the jury and conducted an evidentiary hearing on the admissibility of M.R.'s testimony about the child's PTSD. M.R. remained on the stand and testified that in 2017, the younger child had shown anger issues with other children in day care, and he would not speak in complete sentences. The child was evaluated by Clinica Sierra Vista, and M.R. told the therapist about the conflicts with defendant. In August 2017, the child was diagnosed with PTSD, and started to receive treatment from the clinic. M.R. also attended the therapy sessions. The child constantly asked to see defendant.

M.R. testified that she went to talk to defendant in November 2017, when defendant was still on the run, and after the child was diagnosed with PTSD, because she was concerned about the child's well-being. M.R. intended to tell defendant to sober up and go to the supervised visitations because the children needed him. She explained that seeing defendant's picture or hearing his name was a "trigger" for the child's problems.

### D. *The Parties' Arguments About the PTSD Evidence*

Defense counsel moved for a mistrial based on M.R.'s testimony before the jury that the child had PTSD. Counsel argued the child's PTSD was not relevant since

defendant was not charged with child abuse or child endangerment in this case. Defense counsel asserted M.R.'s testimony was hearsay as to the alleged diagnosis that was made by the clinic, a medical professional would be the only witness qualified on this subject, and speculated the child's PTSD could have resulted from M.R.'s alleged physical violence against defendant.

The court asked whether the child's PTSD was relevant for the limited purpose of explaining why M.R. confronted defendant in November 2017, and not for the truth of the matter. Defense counsel disagreed and said M.R.'s credibility was already in doubt and questioned whether M.R. had been truthful with the child's therapist about her own conduct against defendant. Counsel argued M.R. could not testify to a medical diagnosis and the evidence was highly prejudicial.

The prosecutor argued defense counsel brought up the issue because she asked M.R. about going to defendant's house and confronting him. M.R.'s testimony was relevant to explain why she went there, and defense counsel "absolutely made it fair play." Defense counsel replied that she never asked about PTSD.

### E.     *The Court's Ruling*

The court held M.R.'s testimony about the child's diagnosis of PTSD was admissible to explain why she went to defendant's house that night, but the evidence was not admissible for the truth of the matter. The court denied defendant's motion for mistrial and intended to instruct the jury on the limited admissibility of the evidence.

### F.     *The Limiting Instruction*

Thereafter, the jury returned, and the court gave the following instruction:

> "[T]he mention … of PTSD by the witness on her [child] … comes in for the limited purpose of explaining the lady's actions and course of conduct after receiving the diagnosis for her [child]. Not for the truth of the matter, just to explain her course of conduct."

M.R. resumed her testimony in front of the jury as set forth in the factual statement above, and explained that she went to defendant's house in November 2017 to

66.

confront him because the younger child had been diagnosed with PTSD, she went with a gang member, and she wanted defendant to attend the supervised visitations and get involved in the children's life again.

### G.     *Analysis – PTSD*

Defendant asserts M.R.'s testimony about the child's PTSD represented another discovery violation because the prosecution failed to timely disclose this information or M.R.'s statements about this topic.  As set forth above, however, the prosecutor told defense counsel about M.R.'s disclosure of the child's PTSD diagnosis immediately after M.R. made these statements to the prosecutor on the first day of trial.  Defense counsel never disputed the prosecutor's statements about this fact.  In response to defense counsel's subsequent objections, the prosecutor again stated that she had not obtained any additional statements from M.R. about the child's PTSD diagnosis.

As we found in issue IV, *ante*, the prosecutor provided the PTSD information immediately after M.R. told her about it, and there was no violation of discovery.  (*Mora, supra,* 5 Cal.5th at p. 468.)

As for M.R.'s trial testimony, the trial court did not abuse its discretion when it found the defense opened the door to this subject by cross-examining M.R. about confronting defendant in November 2017 and questioning her motive for doing so.  On redirect examination, the prosecutor asked M.R. why she decided to confront defendant, and she responded by referring to the child's PTSD diagnosis.  The court did not abuse its discretion when it permitted M.R. to fully testify about this reason, particularly since the court gave a limiting instruction that her testimony about the child's diagnosis was not being admitted for the truth of the matter but to explain her reasons for going to defendant's house – a subject that was raised in the first instance by the defense in an attempt to show that M.R. was not afraid to confront him.

67.

**VI.    Discovery – the Clinic's Report and the Nurse's Testimony**

Defendant's final claim of a discovery violation is based on the prosecutor's alleged failure to timely disclosure the report from Clinica Sierra Vista about M.R.'s examination after defendant assaulted her in October 2016, and the intent to call the nurse to testify about that report.  Defendant argues the court abused its discretion by allowing the prosecution to reopen for the nurse to testify about this examination.

**A.    *First Day of Trial – Production of the Clinic's Report***

As set forth in issue IV, *ante*, there was a lengthy discussion on the first day of trial between the court and the parties that resulted in the production of the two documents that M.R. gave to a deputy in December 2016:  her new rental agreement, and the report from Clinica Sierra Vista about her examination after the assault on October 15, 2016.  The report identified "Mejia" as the nurse who examined M.R.; Mejia was not on the prosecutor's pretrial list of witnesses.

**B.    *The Prosecution's Motion to Reopen to Call the Nurse***

On May 24, 2018, the prosecution rested subject to the admission of exhibits.  The defense also rested without calling any witnesses.

On the morning of May 25, 2018, the court stated that the prosecutor had requested a subpoena for Mejia, the nurse who examined M.R. at Clinica Sierra Vista in Lamont in October 2016 and prepared the report about her injuries.  The prosecutor said she had issued the subpoena after obtaining the clinic's report and learning the nurse's name on the first day of trial, but just found out that Deputy Silva in Lamont failed to serve it.  The prosecutor determined the nurse was not at work that day and moved to reopen to call the nurse to testify the following day.

Defense counsel objected and asserted this was another example of the prosecutor's violation of discovery because Mejia was not on the prosecution's witness list, and the clinic's report was not turned over until the first day of trial.  Defense

68.

counsel requested a continuance for one month to fully investigate Mejia's training, background, experience, and the statements in the report.

The prosecutor again explained that Deputy Vega's supplemental report of December 6, 2016, identified both Clinica Sierra Vista's report and M.R.'s new rental agreement as documents that had been booked into evidence, Vega's investigative report was provided to the defense in December 2016, and the defense had never requested the documents identified in the report. "So to sit here and tell this Court that counsel had no idea about these things being in existence is a farce" because the documents were identified in the supplemental report timely provided to defense counsel.

The prosecutor reminded the court while there was some initial confusion about the location of these two documents, they were found and given to both parties on the first day of trial, and it was "absolutely untrue" for defense counsel to say that she lacked notice of the existence of the clinic's report.

The prosecutor further stated she did not learn the nurse's name until she read the clinic's report on the first day of trial. At that time, she advised the court by e-mail, and personally spoke to defense counsel in the courtroom, that she was issuing a subpoena for the nurse identified in the report. When the prosecutor did not hear from the nurse, she thought the deputy had been unable to locate the witness and serve the subpoena, and never placed her on the witness list. After the prosecution rested, the prosecutor discovered the deputy in Lamont had not served the subpoena on the nurse, and that was being done "right now." The prosecutor had not spoken with Mejia and did not have any pretrial statements from her.

Defense counsel requested a continuance and complained there was no time to investigate whether M.R. had a relationship with Mejia that would have influenced the contents of the clinic's report about M.R.'s alleged injuries.

The court found good cause to grant the prosecution's motion to reopen to call the nurse. It also found the defense would not be prejudiced because the nurse's report

contained information that had already been provided in discovery and introduced into evidence – that M.R. reported her boyfriend assaulted her and caused bruising on her face on October 15, 2016, and Deputy Vega observed the bruises on her face.

The court granted the defense request to conduct an evidentiary hearing before the nurse testified. The court stated the clinic's report would not be admitted until the nurse established a foundation for its admissibility.

### C. *The Evidentiary Hearing About the Nurse's Testimony*

On the afternoon of May 25, 2018, the court conducted an evidentiary hearing with Mejia to determine the admissibility of her testimony. Mejia's hearing testimony was consistent with her trial testimony, as set forth above.

Defense counsel again objected to Mejia's appearance and suggested the parties could stipulate to her proposed testimony. Counsel also questioned the chain of custody for the clinic's report because they were using the document that M.R. gave to the deputy in December 2016, and counsel speculated that M.R. could have altered it.

The court overruled the defense objections but asked Mejia to produce the clinic's original report when she returned to testify since it was requested in the subpoena, and she agreed.

As set forth in the factual statement, Mejia testified at trial, produced the report obtained from the clinic's records, and relied on the report to refresh her recollection.

### D. *Defendant's Request for CALCRIM No. 306*

On May 29, 2018, defendant filed a motion for the court give CALCRIM No. 306, untimely disclosure of evidence. This instruction advises the jury that a party's failure to comply with discovery "may deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial," and "[i]n evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

70.

Defense counsel stated that the prosecutor belatedly provided contact information for Maria and A.C., M.R.'s statement that her child had PTSD, M.R.'s new rental agreement, the report from Clinica Sierra Vista about M.R.'s examination, and the name of the nurse who examined her after the trial had started. Defense counsel argued the prosecution's belated production of this information during trial violated discovery, and the court should give CALCRIM No. 306 as a sanction.

The court denied the defense request for the instruction and found there were no prejudicial violations of discovery.

### E. *Analysis – the Clinic's Report and the Nurse's Testimony*

Defendant renews his trial arguments that the prosecution violated discovery by failing to timely provide the report from Clinica Sierra Vista and the intent to call the nurse as a witness. As noted in issue V, *ante*, the prosecution timely provided the supplemental investigative report from December 2016 to the defense that identified the clinic's report as a document that had been received and booked into evidence.

To the extent that the prosecution was obliged to produce the clinic's report, it did so on the first day of trial when the report was located and produced to both parties. The prosecutor said she had not seen the clinic's report before that time, learned the nurse's name when she read the report, and immediately told the court and defense counsel that she was going to issue a subpoena for the nurse to testify. Defense counsel did not refute the prosecutor's statements about how this information was provided.

The parties thus simultaneously learned the details about the clinic's report and the nurse's name, and the defense learned the prosecutor's intent to call the nurse, "which satisfie[d] the statutory requirement of immediate disclosure of materials that become known during trial. [Citations.]" (*People v. Verdugo*, *supra*, 50 Cal.4th at p. 287.)

The court did not abuse its discretion when it granted the prosecution's motion to reopen given the deputy's failure to serve the nurse with a subpoena given the prosecutor's explanation about that situation. More importantly, however, the nurse's

testimony and the clinic's report did not result in the presentation of new evidence about the charged offenses. The defense was well aware of the statements M.R. made to Deputy Vega about the assault, that defendant hit her face and body, and she suffered bruises. Vega testified that he observed these bruises. At trial, the testimony from M.R. and Vega was consistent with their prior statements about the nature of M.R.'s visible injuries. The nurse relied on the report to refresh her recollection, and testified that M.R. said her boyfriend assaulted her, and the nurse also observed the bruises.

The defense was thus aware of the prosecutor's intent to call the nurse and, to the extent the prosecutor failed to timely disclose the clinic's report, any error is not prejudicial since the report and the nurse's testimony did not reveal any new information.

### F.    *CALCRIM NO. 306*

Finally, defendant argues the court abused its discretion when it refused to give CALCRIM No. 308 on the discovery violations. The court has broad discretion to fashion a remedy for a prejudicial violation of discovery, including giving CALCRIM No. 306. (See, e.g., *People v. Verdugo, supra*, 50 Cal.4th at p. 280–282; *People v. Jenkins* (2000) 22 Cal.4th 900, 951; *People v. Riggs* (2008) 44 Cal.4th 248, 307–311; *People v. Bell* (2004) 118 Cal.App.4th 249, 254–257.)

The court did not abuse its discretion when it declined to give CALCRIM No. 306 on the late discovery of evidence. As explained above, the prosecutor complied with the defense discovery requests, immediately turned over information when she learned about it during trial, repeatedly advised the defense that she did not have additional statements from witnesses, and the failure to provide the clinic's report prior to trial was not prejudicial since it did not contain any new information.

## VII.   Prosecutorial Misconduct

Defendant next asserts the prosecutor committed prejudicial misconduct in several sections of her closing rebuttal argument when she responded to defense counsel's argument.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's … intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

"Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa, supra*, 15 Cal.4th at p. 841.)

" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct.' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 858.) The failure to object or request an admonition also may be excused if either would have been futile. (*People v. Potts* (2019) 6 Cal.5th 1012, 1035; *People v. Najera* (2006) 138 Cal.App.4th 212, 224.)

### A. *The Prosecutor's Closing Argument*

The prosecutor used closing argument to outline the elements of the charged offenses. The prosecutor also reviewed the evidence about the prior domestic violence incidents and clarified the jury could only consider that evidence for defendant's intent and disposition to commit further acts of domestic violence.

### B. *Defense Counsel's Closing Argument*

In her closing argument, defense counsel asserted that M.R. loved defendant, he did not want to be with her anymore, and she was upset that he "disrespected" her by

cheating with other women. Counsel argued M.R. "responded to those claims of infidelity by becoming angry, resentful, and accusatory of [defendant] for things he's not done."

Counsel further argued "all the evidence has shown" in this case is that "[a] cheating lover, a hurt woman, and [the] dynamics of their relationship [do] not call for a place inside this courtroom." "When the district attorney closed yesterday, she asked for justice for [M.R.]. But justice for a woman who has been cheated on and who has been lied to cannot and does not take place in this building." Defendant did not realize "the full extent of [her] jealous nature" until he ended their affair.

Defense counsel argued the evidence was weak and questionable because it was only based on M.R.'s testimony and Deputy Vega's "lack of investigation," M.R. was lying about the prior acts of domestic violence and the charged offenses, and she called the police when she found out that he was cheating on her and she was angry with him. Defense counsel criticized Vega for failing to thoroughly investigate the charged offenses, take photographs of M.R.'s alleged injuries, and record her prior statements.

Defense counsel further argued there was no independent evidence about the alleged assaults, or when or how M.R. was injured. Counsel questioned M.R.'s credibility because she admitted giving inconsistent statements about both the prior acts and the charged offenses; her admissions that she fought with defendant and his other girlfriends in the past; and her failure to previously disclose that she went to defendant's house with a document gang member to ask him to get more involved with their children, when she claimed to be afraid of defendant.

Counsel concluded by asking the jury to consider whether it was reasonable that M.R. "is a lover scorned and wants [defendant] to be punished? We know this based upon what we heard, based upon what she testified to." Counsel asked the jury to find defendant not guilty because the prosecution failed to prove his guilty beyond a

74.

reasonable doubt with "these weak links and links that are missing," and to remember M.R. "has lied to law enforcement, that has lied on the stand."

## C.    *The Prosecutor's Rebuttal Argument*

Defendant's claims of misconduct are based on several sections of the prosecutor's rebuttal argument where she responded to defense counsel.  We will consider these claims of error in sequential order.

The prosecutor began rebuttal by stating that "[w]e don't get to pick the victims.  The defendant picked his victim.  And he victimized her repeatedly."  While M.R. was not the "parent of the year," defendant was the person on trial and not M.R.

The prosecutor said defense counsel wanted the jury to believe that M.R. lied about everything, asked what would M.R. get "from coming here and going through this process," calling law enforcement for help for over five years, going through the process twice to get a stay-away order, and risking humiliation when testifying at trial after being battered for years.

## D.    *Defendant's First Claim of Misconduct*

Defendant's first claim of prosecutorial misconduct is based on the next sequence of the prosecutor's rebuttal:

> "[The prosecutor]:  … To what end does [M.R.] have to stand before you or sit before you and lie?  She says she doesn't love him anymore.  She just wants him to be a father to the kids.  She wants what any mother wants.  She wants her children to have a father in their life.  Did she make bad choices?  Is taking Junior to your ex's house a bad choice?  Yeah, it's a bad choice, and [defense counsel] wanted you to hear about it.  How many questions did you hear from [defense counsel] that started with, a known Lamont gang member on trial for murder?  *Because when the evidence is so stacked against you, you got to dirty up someone else.*
>
> "[Defense counsel]:  Objection.  Burden shifting; improper argument.
>
> "THE COURT:  Ladies and gentlemen, as we pointed out before, there's no burden on either the defendant or the accused party's attorney.

75.

Sole burden is on the prosecution.  Counsel and both counsel are arguing the evidence what can be reasonably inferred from the evidence." (Italics added.)

### 1. Analysis

On appeal, defendant argues the prosecutor committed misconduct by denigrating defense counsel in the italicized excerpt above.

"Personal attacks on the integrity of opposing counsel can constitute misconduct. [Citation.]  'It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation].  Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom.'  [Citation.]" (*People v. Winbush* (2017) 2 Cal.5th 402, 484.)

"Nevertheless, the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account....  Misconduct claims also have been rejected … where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support.  [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846.)  A prosecutor's description of defense's counsel's arguments as " 'ridiculous' " and " 'outrageous' " is not misconduct. (*People v. Peoples* (2016) 62 Cal.4th 718, 793.)  In addition, a prosecutor's invitation to the jury to focus on the evidence and not on defense counsel's arguments, referred to as "defense 'tricks' or 'moves' " is not a personal attack on counsel's integrity. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203–1204.)

In *People v. Frye* (1998) 18 Cal.4th 894, disapproved on other grounds in *People v Doolin*, *supra*, 45 Cal.4th at p. 420, the prosecutor called defense counsel " 'irresponsible' " for raising suspicions about a witness. (*Frye*, at p. 978.)  *Frye* held the prosecutor did not commit misconduct because the point of the argument was "counsel's lack of evidentiary support for such a claim.  Because the focus of her comment was on the evidence adduced at trial, rather than on the integrity of defense counsel, it was

proper. Nor was it objectionable for the prosecutor to characterize defense counsel's challenge to [another witness's] credibility as 'ludicrous' and 'a smoke screen.' The record shows that the prosecutor made this charge in the context of reviewing the evidence pertaining to the time of day the murders took place," and the argument was "a fair response" to defense counsel's challenges to the witnesses' credibility. (*Ibid*.)

In this case, defense counsel attacked M.R.'s credibility, questioned the cause of the injuries observed by the deputy and the nurse, and asserted that she lied about every aspect of the prior acts and the charged offenses. In rebuttal, the prosecutor argued the defense strategy was to "dirty up" M.R. because the evidence was stacked against defendant. As in *Frye*, the prosecutor's rebuttal constituted fair comment and criticism of the defense theory of the case and that it lacked any evidentiary support and did not constitute misconduct.

While defense counsel objected to this part of argument, she did not object to the court's admonition or request further instruction to the jury. In any event, the court immediately instructed the jury that the People had the burden of proof, and this admonition cured any possible misconduct.

### E. *Defendant's Second Claim of Misconduct*

Defendant relies on the next part of the prosecutor's argument as another point of misconduct, when the prosecutor replied to defense counsel's attacks on M.R.'s credibility and her prior inconsistent statements about the prior acts and the charged offenses. The prosecutor acknowledged M.R. gave inconsistent statements about the prior incident in July 2016, and she failed to tell the deputy that she allowed defendant to spend the night at her apartment:

> "[The prosecutor]: [W]hy do you think she let him in the night before [in July 2016]? Look what happened in April 2016 when she told him no. She was holding her three year old, and she gets a kick and whack to the back of the head. The next month later, she tells you about how he came to her house and broke in again – broke into the apartment. She was

77.

calling 911 when he took her cell phone. What happens when she tells him no? She gets beat. So in July, she says yes, she lets him stay. And then she asked him to leave and what happens? She gets beat. She gets hit with a shoe. She gets thrown on the ground. And her kid gets taken by a guy with a gun.

"*It must be nice to put yourself in the position of a domestic violence victim who has been beaten for eight years, who has had their child taken from them, who has been humiliated and to stand before you and say, that's not how you should act. That's not how you should feel. But that's what [defense counsel] just did.*

"[Defense counsel]: Objection. Improper argument.

"THE COURT: Again, counsel has broad discretion in discussing legal and factual merits of a case and fair comment on the evidence and what can be reasonably inferred from the evidence." (Italics added.)

### 1. Analysis

Defendant argues that in the italicized excerpts above, the prosecutor committed misconduct by again "casting aspersions" on defense counsel. (AOB 74) The prosecutor's argument did not denigrate counsel, but instead attacked the defense theory that M.R. lied about every aspect of the case. " ' "To observe that an experienced defense counsel will attempt to 'twist' and 'poke' at the prosecution's case does not amount to a personal attack on counsel's integrity." [Citation.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 338–339.)

Defendant also asserts the prosecutor improperly appealed to the jury's sympathies. It is misconduct for the prosecutor to "appeal to the jury to view the crime through the eyes of the victim." (*People v. Mendoza* (2007) 42 Cal.4th 686, 704.) In *People v. Young* (2019) 7 Cal.5th 905, the prosecutor argued that the murder victims complied with the robbers' demands and " 'I'm certain, [they were] very fearful ….' " (*Id*. at p. 933.) *Young* held the prosecutor did not appeal to the jury to have sympathy for the victims, but instead relied on the uncontroverted trial evidence about the manner in which the victims were murdered, and "ask[ed] the jury to draw the logical inference that

78.

[the victims] felt fear. [Citation.]" (*Ibid*.) The prosecutor's invitation to draw "this limited inference" did not ask the jury to put themselves in the victims' shoes or improperly appeal to the jurors' sympathy for the victims. (*Ibid*.)

As in *Young*, the prosecutor in this case did not commit misconduct and instead relied on the evidence that defendant had physically abused and threatened M.R. over the entirety of their relationship, and disappeared with their child during the July 2016 incident, to argue that M.R. feared defendant to explain the inconsistencies in her prior statements, and she had no motive to lie in her trial testimony.

As with the first claim of misconduct, defense counsel objected to this part of argument, the court immediately instructed the jury that the prosecutor had broad discretion to comment on the inferences arising from the evidence, and defense counsel did not object to the court's admonition or request additional instructions.

### F.      *Defendant's Third Claim of Misconduct*

Defendant's next claim of misconduct is based on the prosecutor's following argument:

> "[*Defense counsel*] *says something about the dynamic about this relationship that don't belong in this courtroom. That's offensive.* That's exactly where this belongs is inside this courtroom. We're supposed to wait? Wait for what? He needs to be held accountable now. And I don't know what the inference is supposed to be that the deputies couldn't find the defendant at [his parents' house], but you did hear the deputies testify that they were given that address, and then they would go to the house to check for him, but, shockingly, when somebody doesn't want to be caught by law enforcement, they don't run home. That doesn't seem like a big stretch of the imagination.
>
> "Ladies and gentlemen, I'm going through my notes, and I want to respond to everything, but I don't want to keep you here all morning. There were so many things that were said. Like how there were no separate, extra individual witnesses. But common sense tells you when criminals go to commit crime, they don't do it in front of an audience because that's one surefire way to not get away with it. Right? But you do have witnesses. You have [M.R.] who has been on the receiving end of all

this.  You have people who called 911.  *And to sit there and say with a straight face that the 911 call on October 15th, 2016, is a lie is offensive*.  Listen to the emotion in [A.C.].  Listen to her mom chirping behind her.  And that's not transcribed for you, but you can hear her mom talking in Spanish behind her.  Those women were scared.  (Italics added.)

### 1.  Analysis

Defendant did not object to this portion of argument.  On appeal, however, he argues the prosecutor again committed misconduct by denigrating defense counsel in the italicized excerpts above.  While defendant forfeited this claim of misconduct by failing to object, we will address the merits to avoid an inevitable claim of ineffective assistance of counsel.  (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 92.)

In her closing argument, defense counsel asserted M.R. was "angry, resentful, and accusatory of [defendant] for things he's not done."  Counsel argued that "[a] cheating lover, a hurt woman, and [the] dynamics of their relationship [do] not call for a place inside this courtroom," and the trial was not the place for Rodriguez to receive justice for her disputes with defendant.

Given the nature of defense counsel's arguments, the prosecutor used rebuttal to assert the evidence refuted counsel's claims that M.R. fabricated all the prior incidents and the charged offenses, and further argued the trial was the appropriate place to address defendant's physical abuse of M.R.

The prosecutor did not commit misconduct and defense counsel's failure to object was not prejudicial.

### G.  *Defendant's Fourth Claim of Misconduct*

Defendant's final claim of misconduct is based on the prosecutor's response to defense counsel's claim that no one else saw defendant commit the prior acts or the charged offenses:

"[The prosecutor]:  … But you do have witnesses.  You have [M.R.] who has been on the receiving end of all this.  You have people who called 911.  And to sit there and say with a straight face that the 911 call on October 15th, 2016, is a lie is offensive.  Listen to the emotion in [A.C.].

80.

Listen to her mom chirping behind her. And that's not [in the] transcript for you, but you can hear her mom talking in Spanish behind her. Those women were scared. [¶] [A.C.] called 911 because she spoke English. It's the quickest way to get help. She was scared for her friend because even she knew how much this man had been beating her. She was scared for her friend's life. *Imagine the fear that [M.R.] was under.*

"[Defense counsel]: Objection. Improper argument.

"THE COURT: Again, both counsel have the opportunity to draw reasonable inferences or deductions from evidence presented and argue the evidence and what can be inferred there from." (Italics added.)

### 1. Analysis

Defendant claims the italicized argument again amounted to an improper appeal to the jury for sympathy. As in *Young*, however, the prosecutor was relying on the evidence to argue the circumstances showed that M.R., A.C., and Maria were fearful of defendant based on his prior acts of domestic violence, that fear could be heard in the voices of A.C. and Maria on the 911 call, and M.R. testified that she was frightened when defendant broke down the door and appeared in her apartment.

As with the other claims, the court admonished the jury and defense counsel did not request an additional admonition or instruction.

Finally, defendant argues that while counsel objected to several of these claims of misconduct, she did not ask for further admonitions because the court overruled her objections and any further requests would have been futile. To the contrary, the court immediately admonished the jury, and never made any statements that would have prevented defense counsel from requesting a sidebar or further instructions to the jury about the alleged claims of improper argument.

## VIII. Cumulative Error

Defendant contends the cumulative effect of the following errors violated his constitutional rights to due process and a fair trial: the admission of evidence about the prior acts of domestic violence, amendment of count 4, failure to give the unanimity

instruction, admitting A.C.'s 911 call at the time of the charged offenses, overruling the discovery objections, and overruling objections to the prosecutor's rebuttal argument.

Defendant asserts that if this court "finds error occurred on two or more of these issues, but that prejudice did not accumulate as a result of any one of these errors," then his convictions must be reversed because of the denial of his constitutional right to a fair trial.

Defendant's appellate contentions are meritless with the exception of the court's erroneous decision to grant the amendment to count 4, criminal threats. While count 4 must be reversed, the evidence about defendant's threats had already been admitted into evidence as part of the prior acts evidence. Defendant's claims of cumulative error are meritless.

## IX.     Restitution Fine and Fees

At the sentencing hearing, the court imposed a restitution fine of $300 (§ 1202.4, subd. (b)) and suspended the $300 parole revocation fine (§ 1202.45); and ordered full victim restitution in an amount to be determined (§ 1202.4, subd. (f)). It also imposed a $10 crime prevention fee pursuant to section 1202.5, and a total of $160 in court operations assessments (§ 1465.8) and $120 in criminal conviction assessments (Gov. Code, § 70373).

Defendant argues the court improperly imposed the restitution fine, fees, and assessments in this case without determining his ability to pay in violation of his due process rights as stated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157*,* and this court must strike the amounts imposed. *Dueñas* held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's *present* ability to pay" before it imposes any fines or fees. (*Id*. at pp. 1164, 1167, italics added.)[25]

---

[25] The California Supreme Court is currently considering whether trial courts must consider a defendant's ability to pay before imposing or executing fines, fees, and

We disagree with the holding in *Dueñas* and find the matter need not be remanded on this issue. As we explained in *People v. Aviles* (2019) 39 Cal.App.5th 1055 (*Aviles*), we believe *Dueñas* was wrongly decided and an Eighth Amendment analysis is more appropriate to determine whether restitution fines, fees, and assessments in a particular case are grossly disproportionate and thus excessive. (*Aviles*, at pp. 1068–1072.) Under that standard, the fines and fees imposed in this case are not grossly disproportionate to defendant's level of culpability and thus not excessive under the Eighth Amendment. (*Aviles*, at p. 1072.)

Next, to the extent it may be argued *Dueñas* applies to this case, the court imposed the minimum restitution fine of $300, and defendant lacked the statutory authority to object under the governing law at the time of his sentencing hearing and has not forfeited review of the issue. (Cf. *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1153–1154.)

In any event, even if we agreed with *Dueñas*, we would still reject defendant's constitutional claims and find any error arising from the court's failure to make an ability to pay finding was harmless beyond a reasonable doubt since defendant has the ability to pay the fines and fees imposed in this case. (*Chapman v. California*, *supra*, 386 U.S. at p. 24; *People v. Jones* (2019) 36 Cal.App.5th 1028, 1030–1031; *Aviles, supra*, 39 Cal.App.5th at pp. 1075–1077.)

" ' "Ability to pay does not necessarily require existing employment or cash on hand." [Citation.] "[I]n determining whether a defendant has the ability to pay a restitution fine, the court is not limited to considering a defendant's *present* ability but may consider a defendant's ability to pay in the future." [Citation.] This include[s] the defendant's ability to obtain prison wages and to earn money after his release from custody. [Citation.]' [Citations.]" (*Aviles, supra*, 39 Cal.App.5th at p. 1076.)

---

assessments; and if so, which party bears the applicable burden of proof. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 94–98, review granted Nov. 13, 2019, S257844.)

We can infer from the record that defendant has the ability to pay the aggregate amount of fines and fees from probable future wages, including prison wages. (*Aviles, supra*, 39 Cal.App.5th at p. 1076; *People v. Ellis* (2019) 31 Cal.App.5th 1090, 1094; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)

Defendant concedes he was employed prior to his convictions in this case, but argues he lacked the ability to pay any fines or fees because there was no certainty that he would be assigned a job in prison. We believe *People v. Potts* (2019) 6 Cal.5th 1012 (*Potts*) is persuasive on this point. The trial court in *Potts* ordered a defendant convicted of capital murder to pay the statutory maximum restitution fine of $10,000, partially based on the probation officer's erroneous statement that a condemned inmate would be assigned a job in prison. At the time of the hearing, the applicable restitution statute permitted the court to consider the defendant's inability to pay but the defendant did not object. (*Id*. at p. 1055.) The defendant filed a postjudgment motion for the court to reduce the fine because of the court's mistake and his inability to pay, and argued his own source of income in prison was limited to small financial gifts from family and friends. The court denied the motion and found that seizing even a small part of the defendant's income was a minimal burden considering the incredible loss he inflicted to the victim's family. (*Id*. at pp. 1055–1056.)

*Potts* held the trial court abused its discretion when it imposed the fee based on the erroneous belief that a defendant sentenced to death would be permitted to work. However, *Potts* held the error was harmless beyond a reasonable doubt based on the court's findings when it denied the postjudgment motion to modify the fine. (*Potts, supra*, 6 Cal.5th at pp. 1055, 1056.) *Potts* explained that the defendant's alleged inability to pay because he lacked a prison job would be "blunted by the fact that he would retain at least some of the money sent to him" by family and friends. (*Id*. at p. 1056.) The trial court was "permitted to conclude that the monetary burden the restitution fine imposed

on [the] defendant was outweighed by other considerations," such as the seriousness and gravity of the offense, and the circumstances of its commission. (*Id.* at p. 1057.)

There is nothing in the record to show that defendant would be unable to satisfy the fine and fees imposed by the court while serving his prison term, even if he fails to obtain a prison job. While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his prison sentence. (See, e.g., *People v. Lewis* (2009) 46 Cal.4th 1255, 1321; *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505.)

Finally, defendant cites to the provisions of section 987.8 as stating relevant factors to determine whether he has the ability to pay the restitution fine and fees. Section 987.8, subdivision (b) states that if a defendant was provided legal assistance, the court may, after notice and a hearing, "making a determination of the present ability of the defendant to pay all or a portion of the cost thereof." For purposes of this statute, the defendant's " 'ability to pay' means the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided," and includes but is not limited to the defendant's "present" financial position, and his "reasonably discernible future financial position during the following six months." (§ 987.8, subds. (g)(2)(A), (g)(2)(B); *People v. Rodriguez* (2019) 34 Cal.App.5th 641, 646.)

"But there is an important exception: If the defendant is sentenced to prison or to county jail for more than 364 days, he 'shall be determined not to have a reasonably discernible future financial ability to reimburse' defense costs '[u]nless the court finds unusual circumstances.' [Citation.] [¶] Put another way, there is 'a presumption under the statute that a defendant sentenced to prison does not have the ability to reimburse defense costs.' [Citation.] To rebut this presumption, there must be 'unusual circumstances.' [Citation.]" (*People v. Rodriguez, supra,* 34 Cal.App.5th at p. 646; § 987.8, subd. (g)(2)(B).)

As relevant to this case, there is no evidence that defendant was notified that the court was going to consider an order to reimburse defense costs, and the court did not address section 987.8 at the sentencing hearing.  In addition, section 987.8 carries a specific statutory presumption that a defendant sentenced to more than one year in prison does not have the ability to reimburse defense costs.  Such a statutory presumption does not apply to whether he had the ability to pay the statutorily mandated restitution fine and fees.  (See *Aviles, supra*, 39 Cal.App.5th at pp. 1074–1075.)

## **DISPOSITION**

Defendant's conviction in count 4 for criminal threats is reversed, and the term imposed and stayed for that conviction is stricken.

In all other respects, the judgment is affirmed.


POOCHIGIAN, Acting P.J.

I CONCUR:


DETJEN, J.

**MEEHAN, J., Concurring and Dissenting.**

With respect to defendant's *Dueñas* claim addressed in part IX. of the Discussion, I agree with the majority that defendant did not forfeit review of his claim, but on this undeveloped record, I would follow the decision in *People v. Montes* (2021) 59 Cal.App.5th 1107, 1111 (*Montes*) and remand the matter to allow the parties to address the issues and develop the record. Therefore, I respectfully dissent.

As explained in *Montes*, "[w]here, … a defendant advances a claim premised on a significant and unforeseeable development in the law that occurred after sentencing and during the pendency of the appeal; there was no statutory right to object to the restitution fine and court assessments at issue; and the record is wholly undeveloped on the issue, a limited remand is appropriate to allow the parties to address the issue in the trial court in the first instance." (*Montes*, *supra*, 59 Cal.App.5th at p. 1122.) "Discretion to determine an appropriate fine amount rests with the trial court and the court is free to consider, among other factors, any money received by a defendant, be it in the form of prison wages or gifts. (*People v. Potts* (2019) 6 Cal.5th 1012, 1055–1056 [concluding trial court could lawfully impose $10,000 restitution fine despite condemned inmate's categorical ineligibility to earn prison wages and his receipt of only occasional small gifts of money from family, and rejecting argument 'that a fine is automatically invalid if a defendant is unable to pay it'].)" (*Ibid.*)

The majority concludes that any error is harmless, and "there is authority supporting the proposition that prisoners are able to pay fines, fees and assessments out of future prison wages (*People v. Santos* [(2019)] 38 Cal.App.5th [923,] 934; [*People v.*] *Kopp* [(2019)] 38 Cal.App.5th [47,] 96, review granted [Nov. 13, 2019, S257844]; [*People v.*] *Jones* [(2019)] 36 Cal.App.5th [1028,] 1035; *People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397; *People v. Gentry* (1994) 28 Cal.App.4th 1374, 1376–1377; *People v. Frye* (1994) 21 Cal.App.4th 1483, 1487), or small gifts from friends or family (*People v. Potts*, *supra*, 6 Cal.5th at pp. 1055–1056) .…" (*Montes*, *supra*, 59 Cal.App.5th

1.

at p. 1123.)  However, in the absence of any record regarding defendant's present and future ability to pay, a finding of harmless error requires speculation.  (*Ibid.*)

On these grounds and with the exception of the forfeiture issue, I respectfully dissent from the majority's conclusions in part IX. of the Discussion.


MEEHAN, J.